**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTOR H. ALVARADO BALDERRAMO and LUIS FALQUEZ, Individually and on behalf of all other persons similarly situated,<br><br>                  Plaintiffs,<br><br>   -against-<br><br>GO NEW YORK TOURS INC. and ASEN KOSTADINOV, jointly and severally,<br><br>                  Defendants. | 15-cv-02326<br><br>(ER) (DF) |


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS**
**FOR SUMMARY JUDGMENT AND RULE 11 SANCTIONS**


**BARTON LLP**
711 Third Avenue, 14th Floor
New York, New York 10017
(212) 687-6262

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ............................................................................ iii

FACTUAL BACKGROUND ............................................................................ 1

ARGUMENT .................................................................................................... 1

   I.   LEGAL STANDARD ON SUMMARY JUDGMENT ............................. 1

   II.  GO NEW YORK HAS REPEATEDLY OFFERED TO MAKE
   DRIVERS WHOLE FOR THE LIMITED PERIOD OF TIME
   THAT THEY WERE NOT PAID FOR OVERTIME
   AT THE TIME AND A HALF RATE ...................................................... 2

   III.   PLAINTIFFS' ABUSIVE, VEXATIOUS AND
   FRAUDLENT CLAIMS AGAINST GO NEW YORK
   AND ASEN KOSTADINOV WARRANT DISMISSAL OF ALL CLAIMS ........... 4

      A.   Plaintiffs Grossly Exaggerated The Number of Hours
      That They Worked For Go New York, And Vastly
      Understated The Amounts They Were Paid. ....................................... 6

      B.   Class Representatives Alvarado and Falquez and
      Other Drivers Flat Out Lied About Receiving Cash Payments For Overtime. ........ 9

      C.   Class Representatives Alvarado and Falquez,
      Among Others, Lied About  Receiving Tips in Cash............................ 12

      D.   Class Representatives Alvarado and Falquez,
      Among Others,  Lied About Receiving Bonuses. ............................... 13

      E.   Plaintiffs Lied About Having to Pay For Uniform Maintenance.................... 13

   IV.   PLAINTIFFS' SECOND CLAIM FOR RELIEF
   PUSUANT TO THE MINIMUM WAGE ACT WAS

FALSE AND MUST BE DISMISSED ON SUMMARY JUDGMENT ...................................15

V.   PLAINTIFFS' THIRD CLAIM FOR RELIEF THAT
THEY WERE NOT TIMELY PAID WAGES MUST BE DISMISSED .................................15

VI.   PLAINTIFFS' FOURTH CLAIM PURSUANT TO THE WAGE THEFT
PREVENTION ACT ("WTPA") MUST BE DISMISSED.........................................................16

VII.   UNDER THE DOCTRINES OF UNCLEAN HANDS AND LACHES, CLASS
MEMBERS WHO REQUESTED CASH PAYMENTS FOR OVERTIME AS A
SUBSTITUTE FOR TIME AND A HALF PAYMENTS BY CHECK SHOULD NOT BE
PERMITTED TO DEMAND ADDITIONAL COMPENSATION FOR OVERTIME............19

VIII.   THE ZELLER FIRM'S EXTENSIVE MISCONDUCT WARRANTS SANCTIONS
PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. SECTION 1927...................................20

CONCLUSION..............................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................................2

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
  498 U.S. (1991) ............................................................................................20

*C.C.S. Communication Control, Inc. v. Sklar*,
  1987 WL 12085 ............................................................................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................................2

*Collins v. Daniels*,
  916 F.3d 1320 (10 Cir 2019) ..........................................................................20

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990) ......................................................................................20

*Eastway Constr. Corp. v. City of New York*,
  762 F.2d 243 ..........................................................................................20, 23

*Estate of Lennon v. Screen Creations, Ltd.*,
  939 F. Supp. 287 (S.D.N.Y. 1996) .....................................................................19

*In re TCI Ltd.*,
  769 F.2d. 441 (7th Cir. 1985) ..........................................................................20

*Int'l Shipping Co. S.A. v. Hydra Offshore, Inc.*,
  875 F.2d 388 (2d Cir) ....................................................................................20

*Margo v. Weiss*,
  213 F.3d 55 (2d Cir. 2000) ..............................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ............................................2

*Mintz & Gold LLP v. Daibes*,
   No. 15 Civ. 1218, 2015 WL 2130935 (S.D.N.Y. May 6, 2015) ................................................20

*Mok v. 21 Mott St. Restaurant Corp.*,
   Index No. 14-cv-8081 (PKC), 2017 WL 3981308 (S.D.N.Y. Sept. 8, 2017) ....................22, 23

*Ransmeier v. Mariani*,
   718 F.3d 64 (2d Cir. 2013) ..........................................................................................................23

*Rodriguez-Hernandez v. K Bread & Co.*,
   Index No. 15-cv-6848, 2017 WL 2266874. (S.D.N.Y. May 23, 2017) ......................................22

*Topps Co. v. Cadbury Stani S.A.I.C.*,
   526 F.3d 63 (2d Cir. 2008) ............................................................................................................1

*Virginia Properties, LLC v. T-Moble Ne.*,
   *LLL*, 865 F.3d 110 (2d Cir. 2017) ..............................................................................................23

*Wecare Holdings, LLC v. Bedminster Int'l Ltd.*,
   2009 WL 604877 (W.D.N.Y. Mar. 9, 2009) ...............................................................................19

**Statutes**

28 U.S.C. SECTION 1927 ...................................................................................................... passim

29 U.S.C. §§ 203(m), 206(a)(1) ...................................................................................................17

N.Y. Lab. Law § 195(1) ................................................................................................................17

N.Y. Lab. Law § 195(3) ................................................................................................................18

N.Y. Lab. Law § 652 .....................................................................................................................15

**Rules**

Fed. R. Civ. P. 11 ................................................................................................................ii, 20, 23

Fed. R. Civ. P. 11(c)(2) ......................................................................................................1, 6, 24

Fed. R. Civ. P. 56(a) ...........................................................................................................1, 24

Fed. R. Civ. P. 56(c) ...........................................................................................................1, 2

FRCP 11(b) ...................................................................................................................................20

Rule 11(b)(3) of the Federal Rules of Civil Procedure ................................................................23

iv

Rule 56 ............................................................................................................................3

**Regulations**

12 N.Y.C.R.R. § 142-2.4 ...............................................................................................18

12 N.Y.C.R.R. § 146-1.3(b)............................................................................................17

N.Y. Comp. Codes R. & Regs. tit. 12  § 142-2.1 ........................................................15

Defendants Go New York Tours, Inc. ("Go New York") and its President and owner, Asen Kostadinov ("Mr. Kostadinov") (collectively "Defendants"), submit this memorandum of law, a Statement of Material Facts with supporting evidence pursuant to Local Civil Rule 56.1 (hereinafter the "Rule 56.1 Statement"), and the Declaration of Maurice Ross, Esq., sworn to on March 1, 2022 (hereinafter "Horgan Declaration") in support of their motions:

(i)     pursuant to Fed. R. Civ. P. 56(a) for dismissal of Plaintiffs' claims;

(ii)    pursuant to Fed. R. Civ. P. 11(c)(2) for sanctions including, but not limited to, summary judgment dismissal , costs, attorneys' fees, and other sanctions based upon Plaintiffs' and Plaintiffs' counsel's submission of false pleadings, affidavits, and other false representations to this Court;

(iii)   pursuant to 28 U.S.C. § 1927 and the inherent power of this Court for sanctions against Plaintiffs and their counsel including, but not limited to, costs, expenses and attorneys' fees incurred over more than six years of litigation on the ground that they have multiplied these proceedings unreasonably and pursued vexatious litigation; and

(iv)    such other and further relief as this Court may deem appropriate.

## FACTUAL BACKGROUND

Defendants incorporate herein the facts set forth in their Statement of Material Facts Pursuant to Local Civil Rule 56.1 (hereinafter the "Rule 56.1 St.").

## ARGUMENT

## I.   LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (*citing* Fed. R. Civ. P. 56(c)).  When deciding a summary judgment motion, the "court must construe all the evidence in the light most favorable to the nonmoving party, . . . and draw all inferences and resolve all ambiguities in that party's favor." *Id.*

"The burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). "When the moving party has carried its burden under [Fed. R. Civ. P. 56(c)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Indeed, the nonmoving party cannot simply "rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986).

Plaintiff's claims are supported primarily by false representations to this Court, lack any evidentiary support whatsoever, and/or are entirely refuted by substantial evidence produced by Go New York. Accordingly, summary judgment should be granted.

## II. GO NEW YORK HAS REPEATEDLY OFFERED TO MAKE DRIVERS WHOLE FOR THE LIMITED PERIOD OF TIME THAT THEY WERE NOT PAID FOR OVERTIME AT THE TIME AND A HALF RATE

From the beginning of this case, Go New York has admitted that in the early years of its operations, in 2013 to 2014, it failed to pay tour bus drivers time and a half for overtime. Instead, Go New York paid drivers for overtime in cash at their normal hourly rate, and not the time and a half rate to which they were entitled.[1] At the time, Go New York was a very small, family company run by Asen Kostadinov, a 27 year old immigrant from Bulgaria, with no legal counsel.[2] Go New York had only a few double-decker tour buses at the time, and it ran limited

---

1 *See* Rule 56.1 St., ¶¶ 41-45; 65-70.
2 *See* Rule 56.1 St., ¶ 48. As Mr. Kostadinov testified, "First of all, I, myself, I'm not from the U.S. originally, and where I come from – my parents, for example, owned a business, and there was no such thing there as paying a different rate over 40, 50 or 80 or a number of hours. So when I came to the U.S., I did not know anything about

tours, sometimes  few as one tour per day.[3]  It also had very few employees, and only a small number of bus drivers.[4]

By 2013, Go New York first achieved sales over $500,000.00.[5] As the company grew, it took steps to formalize policies and procedures that would ensure compliance with a federal and state labor law requirements.  For example, on October 6, 2014, Go New York installed biometric time clocks so that drivers would clock in and out of work with a thumbprint.[6] Accordingly, since October 6, 2014, all drivers' time was tracked by biometric time clocks, and they received checks or direct deposits for their full amount of pay, including the time and a half rate for overtime.  This is confirmed by both testimony and incontrovertible payroll records.  *See* Rule 56.1 St., ¶ 80.

Additionally, on April 16, 2017, Go New York entered into a contract with South East Personnel Leasing, Inc. ("SPLI") pursuant to which all employees of Go New York became leased employees of SPLI.  From that point on, SPLI handled all aspects of paying employees, including keeping track of employees' time, payment of wages, distribution of payroll checks, preparation of wage and tax statements, administration of employee benefit plans, and workers compensation insurance.   *See* Rule 56.1 St., ¶ 82.  From that point on, payroll was calculated, and drivers were paid by SPLI, and not Go New York.  *Id.*

However, with respect to the limited time period of January 1, 2013 to October 6, 2014, Go New York has owned up to the fact that it failed to pay drivers time and a half for overtime,

---

that you have to pay one and a half times over 40.  Obviously, now I know that, but at the time, I didn't know."  *See* Kostadinov Tr. at Ex. S, p. 116, line 14 – p. 117, line 4.
3 *Id.*, ¶ 51.
4 Baran Aff. at Ex. X, ¶ 4 (stating that he began working as a cashier for Go New York in 2013 and that, at that time, "[t]here were approximately five or six other employees that worked with [him] in the office").
5 *See* Rule 56. 1 St., ¶ 51 (citing Affirmation of Asen Kostadinov, sworn to on April 19, 2021, a copy of which is annexed to the Rule 56.1 St. as **Exhibit W**.
6 *See* Rule 56.1 St., ¶ 78.

and instead paid them by cash for overtime only at their regular hourly rates.[7]   Nonetheless, incontrovertible evidence proves that during this time period, drivers always were paid significantly above the minimum wage, earned cash tips of as much as $300 a week, and received weekly performance-based bonuses.  *See* Rule 56.1 St., ¶¶ 74-77, 103-113 Moreover, Go New York has on multiple occasions offered to resolve this case by (a) paying Plaintiffs the difference between drivers' regular rate and the time and a half rate for the overtime hours for this limited time period and (b) appropriate statutory damages.  *Id.*  The President of Go New York, Mr. Kostadinov confirmed this in his deposition.  *Id.*  Each time Defendants made this $60,000 offer to Plaintiffs, however, it was refused.  *Id.*

Aside from the issue of alleged unpaid overtime during the period of 2013 to 2014, there is not a shred of evidence to justify any allegations of violations of wage and hour laws after the biometric time clocks were installed on October 6, 2014.  Yet, the Zeller Firm has insisted on vexatiously litigating boilerplate claims made from whole cloth covering the entire period of Go New York's operations.

## III. PLAINTIFFS' ABUSIVE, VEXATIOUS AND FRAUDLENT CLAIMS AGAINST GO NEW YORK AND ASEN KOSTADINOV WARRANT DISMISSAL OF ALL CLAIMS

Rather than accept Defendants' multiple offers, or even engage in good faith negotiations to obtain a fair settlement on behalf of the drivers, Plaintiffs and the Zeller Firm chose to weaponize one small error made by a fledgling company into an all-out war on Go New York Tours.  From the time this case was commenced, Class Representatives Victor H. Alvarado Balderramo ("Alvarado") and Luis Falquez ("Falquez") and the Zeller Firm, among other drivers, have made blatantly false representations to this Court by, *inter alia*, grossly inflating the actual overtime hours that the drivers worked, claiming with no basis whatsoever that drivers

---

7 *See* Rule 56.1 St., ¶¶ 41-46.

were not paid minimum wage, and concealing compensation that the drivers did in fact receive for overtime in cash, cash tips, and bonuses. *See* Rule 56.1 St., Sections IV(A), VI, VII, VIII. Based on Plaintiffs' falsehoods, the Court certified a class in this case on June 28, 2017. *See* Rule 56.1 St., ¶¶ 25-26. Thereafter, the Zeller Firm has engaged in a costly and wholly unnecessary fishing expedition for documents from Go New York and multiple third parties in the hopes of finding proof of other labor law violations. After years of scorched earth discovery, the Zeller firm has found no such evidence.

Indeed, Plaintiffs cannot cite one shred of evidence to support any of the boilerplate labor law claims that they asserted in the Amended Complaint filed in 2016, for the period after Go New York installed biometric clocks. Plaintiffs have no evidence of their own to support their claims in part because the Zeller firm did not reasonably investigate them before submitting their pleadings in this Court. Incredibly, moreover, ***the Zeller Firm never even bothered to instruct drivers to preserve any documents that they may have had relating to this case***. Each and every driver that was deposed in this case has confirmed this. *See* Rule 56.1 St., Sec. XII. The Zeller Firm's utter failure in this regard is further confirmed by letters and emails that the Zeller Firm was recently ordered by the Court to produce which show that although the Zeller Firm desperately tried to contact drivers to join the lawsuit, they never once advised them of their obligation to preserve evidence.

Failing to preserve the records of their clients or conduct any reasonable pre-suit investigation, the Zeller Firm alleged wholly baseless claims against Go New York. The claims reflect almost entirely guess work. There is simply no excuse for counsel's failure in this regard, especially because the Zeller Firm purports to comprise highly experienced class action attorneys, a representation upon which this Court expressly relied in agreeing to certify the class.

They certainly should have been aware of their obligations not to allege unfounded claims, to conduct reasonable investigations before filing suit, and to collect and preserve documents from their clients.[8]   Having been put through six long years of costly discovery, however, Go New York has assembled an arsenal of evidence that completely disproves each and every labor law violation asserted by Plaintiffs (except for the conceded violations during the years 2013-2014). Thus, pursuant to Fed. R. Civ. P. 11(c)(2), each and every claim should be dismissed and other appropriate sanctions should be imposed.

**A. Plaintiffs Grossly Exaggerated The Number of Hours That They Worked For Go New York, And Vastly Understated The Amounts They Were Paid.**

Discovery has confirmed that Plaintiffs grossly exaggerated the number of hours that they worked for Go New York in pleadings and sworn Affidavits.  For example, Class Representative Alvarado initially claimed in the Complaint filed in 2015 that from August 2013 through February 2014, he worked 114 ½ to 121 ½ hours a week as a driver for Go New York.  *See* Comp., Ex. A to Rule 56.1 St., ¶ 19.  The Zeller Firm knew or should have known that this assertion was preposterous.  If the Zeller Firm had conducted even a cursory investigation, it would have realized that no company could have run the risk of allowing drivers of buses carrying large numbers of tourists to repeatedly work 15 to 18 hours per day.  This would result in an intolerable safety risk.  This should have been obvious to the Zeller Firm, but it nonetheless signed and filed the original Complaint.  Moreover, the drivers' claims were preposterous since in 2013 to 2014, Go New York only owned a handful of buses and ran as few as a single tour each day.  *See* Rule 56.1 St., Sec. IV.  Had the attorneys interviewed their clients, personally observed Go New York's operations (which were public and readily reviewable at the street level), and collected and preserved relevant documents, they also would have known these facts.

---

8 *See* Order granting Class Cert. (ECF Doc. No. 104), a copy of which is annexed to the Rule 56.1 St. as **Exhibit R.**

Likewise, for example, in the Amended Complaint and Affidavit filed by the Zeller Firm and Alvarado in 2016, the original 114 ½ to 121 ½ hours that Alvarado claimed to work were reduced to between 70 to 87 hours. *See* Am. Compl. at Ex. I to Rule 56.1 St., ¶ 19.  Since Plaintiffs have no records whatsoever concerning the hours that they worked for Go New York, it is painfully obvious that the Zeller Firm was simply making these hours up out of thin air.[9]  At his deposition, Alvarado admitted that his sworn Affidavit was false.  He admitted that he had no proof to contradict Go New York's contemporaneous time records showing that he never worked more than 46 hours and 55 minutes in a single week. *See* Rule 56.1 St., ¶¶ 120-140.

When Alvarado was confronted with his time records, he tried to concoct a story that would explain his blatant misrepresentation by claiming that he was required to arrive at Go New York's bus yard in Brooklyn at 5:00 a.m. to pick up a tour bus and drive it into to Manhattan. *Id.* The evidence demonstrates that this testimony is patently false since Go New York's passenger tours usually did not begin until 9:00AM, and never before 8:00 a.m., the bus yard did not open until 7:00AM, or a few minutes before 7:00AM, each day, and there would be no need for any drivers to arrive as early as 5:00 a.m. *Id.,* ¶¶ 55, 125-126.  Alvarado also claimed that he wrote down the hours that he worked in a notebook and that he had the notebook in his house. *Id.,* ¶ 177-178.  During his deposition by Zoom, Mr. Alvarado was given time to search for and retrieve the notebook (over five years after he commenced this action) and claimed that it must have gotten lost. *Id.* The Zeller Firm had taken no steps prior to the deposition to locate and produce Alvarado's notebook---indeed, it appears that prior to the deposition the Zeller Firm had not been aware of its existence.

---

9 At his deposition, Plaintiff Alvarado admitted that he had no proof to support his claim that he worked six days a week and a total of 70-87 hours in his Affidavit. *See* Ex. Z, p. 134, line 25 – p. 135, line 8 (*stating* "No, I don't have any records"); p. 138, lines 11-13; p. 139, line 24 – p. 135, line 5; p. 147, lines 5 – 11; p. 160, line 16 – p. 161, line 13.) *See also* Ex. NN, p. 16, lines 15-20; p. 17, line 25 – p. 18, line 7; p. 42, lines 9-16

Similarly, the Zeller Firm submitted an Affidavit from Class Representative Falquez in support of class certification in which Falquez falsely claimed that in 2013 "[w]ith the exception of approximately three weeks, I worked for the defendants approximately between eleven and thirteen hours per day approximately five days hours [sic] per week." Falquez Aff. at Ex. K, ¶ 4. Falquez's claim was preposterous.  Indeed, Go New York's contemporaneous time records show that Falquez only worked at Go New York for a total of 31 days and during that time, he *__never__* worked between 11 to 13 hours per day and that there were several weeks that he only worked four days.  *See* Rule 56.1 St., ¶¶ 91-92.  Like Alvarado, Falquez also admitted that he had no time records of his own and that he had no documents that would contradict that he only worked four days a week.  *Id.*

Another driver, Lionel Briggs, admitted during his deposition that he grossly overstated his hours in the Affidavit he signed, and which was submitted by the Zeller Firm in support of class certification.   In his Affidavit, Briggs stated that he "worked for the defendants approximately 60 hours per week and sometimes more."  Ex. N to Rule 56.1 At his deposition, however, Briggs admitted that he worked a total of five weeks for Go New York and testified "*okay, I'm not saying every week but I'm saying I've worked about 60 hours a week*" and that "*I don't think nobody in their right state of mind can work 60 hours a week* . . .".  Rule 56.1 St., ¶ 93.

Yet another driver, Lawrence Atkinson, also admitted that he grossly overstated his hours in the Affidavit he signed, and which was submitted by the Zeller Firm in support of class certification.   In his Affidavit, Atkinson claims that he "work[ed] for the defendants approximately between twelve and thirteen hours per day approximately five days per week". Ex. M, ¶4.  At his deposition, however, he admitted that the number of hours that he worked

changed seasonally, and that in the winter he could work as few as six hours a day.   Rule 56.1 St., ¶ 153.

## B. Class Representatives Alvarado and Falquez and Other Drivers Flat Out Lied About Receiving Cash Payments For Overtime.

Alvarado and Falquez have repeatedly lied about receiving cash payments for overtime hours that they worked for Go New York in 2013 to 2014 in their sworn Affidavits and at their depositions.[10]   Other drivers that have been deposed, such as Party Plaintiff Lionel Briggs, also flatly lied about receiving cash for overtime.   *See* Briggs Tr. at Ex. Y, p. 58, lines 4-20.   These drivers attempted to conceal these cash payments in order to justify false claims of being underpaid.   *See* Am. Comp., ¶¶ 45-47; 53-61.

These drivers' false claims to never have received cash compensation for overtime in 2013 to 2014 is disproven by uncontroverted documentary evidence from Go New York, Go New York's witnesses, other drivers' testimony, and their own admissions during their depositions.   Indeed, the record of documents and testimony confirms that in 2013 to 2014, all drivers always were paid in cash for overtime.   *See* Rule 56.1 St., Sec. VI.   Eduard Baran, who worked in Go New York's office at this time, testified that his duties at included keeping track of the hours worked by drivers.   *Id.*, ¶ 63.   To do so, he would prepare a weekly handwritten sheet for each driver that clearly stated how many hours of straight time and hours above the forty (40) hours each driver had worked that week.   *Id.*, ¶ 64.   Go New York has produced hundreds of pages of these sheets that have been authenticated by Mr. Baran.   Go New York has even

---

10 *See* Alvarado Aff. at Ex. J, ¶¶ 7-8; Alvarado Tr. II at Ex. NN,, p. 13, line 22 – p. 15, line 5; p. 27, lines 10-13; p. 36, line 4 – p. 37, line 10; *See* Falquez Aff. at Ex. K, ¶ 5 ("The defendants paid me approximately $13.00 per hour for the hours I worked up to forty per week and approximately no wages for the hours I worked over forty each week"); Falquez Tr. at Ex. PP., p. 50, line 1 to p. 51, line 18.   *See also id.*, p. 91, lines 19 – p. 92, line 23; *id.*, p. 123, line 15 – p. 124, line 2.

specifically produced Mr. Baran's handwritten time sheets reflecting contemporaneous cash payments to Alvarado (*see* Ex. BB at D000029 – 45) and Falquez (*see* Ex. CC at D000021).

Additionally, Mr. Baran testified that from 2013-2014, he personally put drivers' paychecks for the regular hours that they worked and cash for any overtime hours that they worked into an envelope, which drivers picked up each week at Go New York's offices.. *Id.*, ¶ 68.  Mr. Kostadinov's wife, Yulia Kostadinova, who also worked in the office in the early years of the company's operations, testified that when she helped out in the office, she also would hand the drivers an envelope containing checks and cash for overtime hours when they came into the office.  Kostadinova Tr. at Ex. U of Rule 56.1 St., pp. 61-74.  The cash that was used to pay the drivers was from cash that Go New York had on hand from ticket sales.  *See* Baran Aff. at Ex. X, ¶ 14.  After receiving an envelope with their check and cash payment for overtime, the drivers would then sign receipts confirming that they received a sum certain of cash as payment for their overtime hours that week.  *See* Rule 56.1 St., ¶¶ 72-73.  ***Go New York has produced hundreds of pages of receipts signed by drivers confirming this***.  Go New York has produced receipts signed by Alvarado and Falquez themselves confirming that they did in fact receive cash payments for overtime.  *See* Ex. EE at D000029 – 45) (Alvarado);  Ex. FF at D000021 (Falquez).  Other drivers also signed receipts confirming that they received cash payments for overtime in 2013 to 2014, but flat out lied about this during their depositions.  For example, Mr. Briggs testified that he "was never paid for overtime in cash" but when he was confronted with a receipt signed by him for $39.60 in cash for overtime on September 19, 2014 (Bates Nos. GONY019940), Mr. Briggs confirmed that it was his signature on the receipt at his deposition.  *See* Briggs Tr. at Ex __, p. 58, line 16 – p. 60, line 15.  He claimed that he "didn't even see that technically, but I didn't receive no cash . . ."  *Id.*  Tellingly, the drivers invoked their Fifth

Amendment privilege not to answer the question of whether they reported these cash payments to the IRS, even those that denied receiving the cash  *See* Rule 56.1 St., ¶ 102.

The false testimony of Alvarado and Falquez, among others, was further refuted by numerous drivers that confirmed that they were regularly and consistently paid in cash for overtime in 2013 to 2014.   For example,  Lawrence Atkinson, who worked as a driver for Go New York from December 2013 to March 2021, testified as follows:

> Q: So as soon as you started, you got the $12 an hour, and then it increased to $15 an hour after the first 30 days, right?
>
> A; Yes, ma'am.
>
> Q: How were you paid in those years, the early years?
>
> A: I was paid 40 hours with the check, and the rest was – cash in an envelope.

Atkinson Tr. at Ex. AA, p. 60, lines 7-22.  He further testified that

> A:  . . . You know, I mean, looking in the envelope and seeing the
>
> cash was beautiful.

*Id.*, p. 97, line 15 – p. 98, line 18.  Other Party Plaintiffs confirmed that they were paid in cash for overtime.  *See* Stewart Tr. at Ex. DD, p. 28, line 19 – p. 29, line 4; Deposition of Andrew Wong, taken on Jan. 27, 2022 ("Wong Tr."), a copy of which is annexed to the Rule 56.1 St. at **Exhibit QQ**, p. 54, line 10 – p. 55, line 11.

Finally, it is important to note that after the biometric timeclocks were put into place, drivers were paid by check for all hours worked and at a time and a half rate for any hours that they worked over 40 hours.  *See* Rule 56.1, ¶¶ 78-80.  From this point on, and through to the present, drivers continue to receive all compensation that they are entitled to pursuant to law and collective bargaining agreements, including bonuses and cash tips.  *Id.*

11

### C. Class Representatives Alvarado and Falquez, Among Others, Lied About Receiving Tips in Cash.

Alvarado and Falquez, among other drivers, purposely concealed the fact that they received cash tips and weekly bonuses in order to justify their false claims that Go New York violated the FLSA and NYLL by paying the drivers less than minimum wage. *See* Am. Comp. at Ex. I, ¶¶ 44-47; 53-61. At his deposition, Balderramo was asked ". . . Did you ever receive cash tips when you were driving buses for Go New York?" and he answered "No."[11] Balderramo was further asked ". . . So if another drivers testified that the tour guides were tipped in cash and that they would split the cash half and half with drivers during 2013-2014, would that driver be lying?" and he answered "Correct. It was not with me. Maybe with other drivers." *Id.*, p. 49, lines 16-24. Falquez also falsely testified that he did not receive cash tips.[12] The proof in this case, however, refutes their false claim not to have received cash tips from tour bus passengers when they worked for Go New York in 2013 to 2014.

It was and continues to be Go New York's policy that drivers may accept cash tips from tour bus passengers. *See* Rule 56.1 St., ¶¶ 111-113. By 2013, tip boxes had been installed on the buses. *Id.* Drivers Atkinson, Briggs, and Stewart all contradicted Alvarado's and Falquez's false claims, and confirmed that they received cash tips in 2013 to 2014. *See* Atkinson Tr. at Ex. AA to Rule 56.1 St., p. 79, line 24 – p. 82, line 16 (confirming that he received cash tips and that there were tip boxes installed on the buses); Briggs Tr. at Ex. Y to Rule 56.1 St., p. 52, line 25 – p. 54, line 5 (confirming that he received tips in cash and that buses had tip boxes). In fact, Mr. Stewart testified at his deposition that he made "[p]robably a little more than a thousand" dollars in tips during the approximately 10 months that he worked for Go New York in 2013 to

---

11 Balderramo Tr. II at Ex. NN to Rule 56.1 St., p. 49, lines 12-15.

12 Falquez Tr. at Ex. PP, p. 157, lines 22-24.

2014. *Id.* It should also be noted that in July 2016, Go New York's practice of allowing drivers to collect cash tips was incorporated into a Collective Bargaining Agreement between the Transport Workers Union Local 100 and Go New York Tours. *See* Addendum to Collective Bargaining Agreement entitled "Tip Box Rules and Procedures" at p. 17.[13] Contrary to all of this evidence, in order to justify their false claims, the Class Representatives and the Zeller Firm have maintained up to the present their false claims that drivers never received cash tips.

### D. Class Representatives Alvarado and Falquez, Among Others, Lied About Receiving Bonuses.

Additionally, the Class Representatives and the Zeller Firm have falsely asserted that drivers did not receive weekly bonuses from Go New York in addition to their regular pay, overtime, and cash tips. In fact, pay stubs show that the drivers regularly and consistently received performance bonuses for complying with Go New York's policies and procedures such as safe driving and arriving on time for their shifts. *See, e.g.,* P008, P009, P010, P011, P012, P013, P014, P018. Go New York enacted this bonus policy in an effort to keep good drivers on its staff, and a copy of the terms was provided to the drivers upon hiring. *See* Rule 56.1 St., ¶ 75. Again, it is well to note that although several drivers admitted to receiving cash tips and bonuses, they tellingly invoked their Fifth Amendment privilege when asked whether they reported these cash payments to the IRS. *Id.*, ¶ 102.

### E. Plaintiffs Lied About Having to Pay For Uniform Maintenance.

In the Amended Complaint, the Zeller Firm falsely alleged that Alvarado "purchased a required uniform, and the defendants failed to reimburse the plaintiff the total cost of the uniform". *See* Am. Compl. at Ex. I to Rule 56.1 St., ¶ 27. This statement was false. In fact,

---

13 A copy of the Collective Bargaining Agreement between the Transport Workers Union Local 100 and GoNY Tours, Inc. dated July 2016 in annexed as **Exhibit KK** to the Rule 56.1 St.

drivers were never required to purchase uniforms.   Rather, the evidence establishes that the drivers' wore a cap, a shirt, black pants and, in colder seasons, a jacket.[14] These garments were provided to the drivers at no cost to the drivers when they were hired by Go New York and replaced as needed thereafter.[15]   *See* Yulia Kostadinov Tr. at Ex. U to Rule 56.1 St., p. 84, line 12 – p. 85, line 21 (testifying that because "[t]he company wants all employees to be presentable at all times", the drivers were given multiple sets of fresh uniforms by Go New York for different seasons and that these uniforms were cleaned by the company).

Numerous drivers, in fact, conceded in their depositions that garments were provided to them by Go New York as needed, and they required no special maintenance.  *See* Falquez Tr. at Ex. PP, p. 148, lines 2-24 (testifying that he received multiple components of his uniform from the office at Go New York); Atkinson Tr.. at Ex. AA, page 77, lines 4-7 ("Q: Did you have to dry clean any of the garments that they gave you, or did you just wash them? A: Just regular wash"; Wong Tr. at  Ex. QQ, p. 75, line 14 – p. 80, line 2 (testifying that he was given multiple components of his uniform that the only cost he incurred to clean them was "[w]hatever the laundromat is charging.  Whatever it costs to dry my clothing").

In sum, in view of the blatant misrepresentations made by Plaintiffs and the Zeller Firm as detailed in Sections A to E, *supra*, Defendants respectfully submit that sanctions should be imposed upon Plaintiffs and their counsel for misconduct and vexatious litigation which has cost Go New York tens of thousands of dollars in attorneys' fees.  Indeed, this Court previously ruled that the Zeller Firm may not be entitled to attorneys' fees based upon their previous lack of

---

14 *See* Alvarado Dep. at Ex. R, p. 67, lines 14-25; Falquez Dep. at Ex. T, p. 147, line 14 – p. 148, line 24; Atkinson Dep. at Ex. U, page 74, line 17 – p. 76, line 7; Stewart Dep. at Ex. V, p. 66, line 4 – p. 67, line 6.

15 *See* Atkinson Tr. at Ex. AA, page 74, line 17 – p. 76, line 7; Stewart Tr. at Ex. V, p. 66, line 4 – p. 67, line 6; Kostadinov Tr. at Ex. S, pp. 127-29; Baran Tr. at Ex. HH, p. 32, lines 5-17; Yulia Kostadinov Tr. at Ex. U, p. 84, lines 2-11.

diligent prosecution of the case,. *See* Order, ECF Doc. No. 104, at Ex. R.

## IV. PLAINTIFFS' SECOND CLAIM FOR RELIEF PUSUANT TO THE MINIMUM WAGE ACT WAS FALSE AND MUST BE DISMISSED ON SUMMARY JUDGMENT

Go New York has always paid drivers a minimum wage or an amount in excess of minimum wage. *See* Kostadinov Dep. at Ex. R, pp. 105-107; Rule 56.1 St., ¶¶ 103-110. Nonetheless, in their Amended Complaint, Plaintiffs alleged that they were paid less than the minimum wage for the relevant years:

> From July 24, 2009, to December 30, 2013, the applicable minimum wage was **$7.25**, and from December 31, 2013, to December 30, 2014, **$8.00**, pursuant to N.Y. Lab. Law § 652 and N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.1.

Am. Compl. at Ex. I, ¶ 53. This claim was false at the time it was alleged on January 22, 2016 and has been known to be false to the drivers and the Zeller Firm throughout this case. Go New York's contemporaneous records establish that even before installing its time clock, drivers were paid at least $12.00 per hour, far in excess of the minimum sage. These records include pay stubs (*see, e.g.* Drivers' paystubs from January 2013 reflecting that they were paid a minimum of $12.00 per hour plus bonuses at Ex. RR, Bates Nos. D004237-4255; Drivers' paystubs from April 2013 reflecting that they were paid a minimum of $12.00 per hour plus bonuses at Ex. SS, Bates Nos. D001097-1124. W-2 Wage and Tax Statements were also provided to each driver, and statements signed by the drivers themselves. *See* Rule 56.1 St., ¶ 110. The Zeller Firm never had any reasonable basis for asserting that Go New York violated minimum wage requirements.

## V. PLAINTIFFS' THIRD CLAIM FOR RELIEF THAT THEY WERE NOT TIMELY PAID WAGES MUST BE DISMISSED

Go New York has always paid its drivers weekly. *See* Kostadinov Tr. at Ex. S, p. 175,

lines 8-22 (testifying that drivers have always been paid weekly); *see also* Go New York pay records at Exs. RR, SS to Rule 56.1 St.; Baran Aff. at Ex. X, ¶ 13.   There is no proof to the contrary.   In fact, the limited documents produced by Alvarado and Falquez as well as the drivers' own testimony confirmed this.   Alvarado produced weekly paystubs (*see* P001-18) and testified that he was paid weekly.   *See* Alvarado Tr. at Ex. Z , p. 144, lines 6-7 ("Q: You were paid weekly? A: Yes, yes.   Weekly").   Go New York also produced weekly paystubs and checks for Falquez (*see* D000017-28 at Ex. OO), and Falquez also admitted that he was paid weekly. Falquez Tr. at Ex. PP, p;. 53, lines 16-22 (Q: Okay. So each check that – and you were paid weekly; is that correct sir? A: I believe so, yes.")   Accordingly, Plaintiffs never had any basis to allege this claim.

Moreover, Go New York has produced thousands of records showing weekly payments to the drivers for all relevant years, including for the early years of 2013 and 2014.[16] Additionally, the records that Go New York obtained from its contract employee leasing service, SPLI, reflect that the drivers have been paid on a weekly basis from April 28, 2017 through 2020.   *See* Rule 56.1 St., ¶ 80.   The Zeller Firm had no basis, whatsoever, to contend that the Drivers were not paid on a timely basis.

## VI.   PLAINTIFFS' FOURTH CLAIM PURSUANT TO THE WAGE THEFT PREVENTION ACT ("WTPA") MUST BE DISMISSED

Plaintiffs' claim pursuant to the WTPA is a moving target since Plaintiffs have refused to specify the basis for this claim beyond the boilerplate allegations in the Amended Complaint. *See* Am Comp. at Ex. H, ¶¶ 68-73.   Plaintiffs' claims not to have received the full amount of wages to which they were entitled is refuted by the fact that drivers were not only paid several dollars

---

16   Representative examples of time records produced by Go New York for 2013 reflecting weekly payments are annexed to the Rule 56.1 St. as **Exhibit RR and SS**.

per hour above minimum wage but that they also received cash tips and bonuses.[17]  Go New York's records demonstrate that drivers were always on notice of and paid the wages to which they were entitled.

**First**, Plaintiffs' claim that Go New York violated N.Y. Lab. Law § 195(1) is false.  *See* Am. Compl. at Ex. I, ¶¶ 34, 69-70.  To the contrary, Go New York always provided drivers with notice of the wages that they would be paid in advance.  Indeed, upon hiring, drivers were provided with a hiring packet.  *See* Exhibit C to the Baran Aff. at Ex. X to Rule 56.1 St., Bates Nos. D000201-218.  The hiring packet included a "Go New York Tours Inc. Driver Employment Letter" as well as a "Payment Schedule" which set forth:

> A)  Base Hourly Payment - $12.00 per hour,
>
> B)  Bonus - $2.00 [if drivers complied with the company policies set forth therein stated below such as no unannounced no-shows and arriving on time for their shift].

*Id.* at D000203.  Go New York has produced hundreds of documents confirming this, including forms signed by Party Plaintiff Andrew Wong (*see* Ex. QQ, Bates Nos. GONY017978-84); Party Plaintiff Kee Chye Chew (*see* Ex. HH, Bates Nos. G0NY018194-98).

Additionally, drivers were provided with a copy of Go New York Tours Field and Warehouse Employees' Policy and Procedure Handbook which set forth the manner in which the drivers would be paid.  *See, e.g.,* Handbook signed by Falquez on September 26, 2014, Bates Nos. D000108-118, at 110-112.  Thereafter, Go New York provided periodic notices advising

---

17 *See Inclan v. New York Hospitality Group, Inc.*, 95 F. Supp.3d 490, 497 (S.D.N.Y. 2015) ("Both the FLSA and the NYLL permit an employer to pay a tipped worker a cash wage that is lower than the statutory minimum wage, provided that the cash wage and the employees' tips, taken together, are at least equivalent to the minimum wage") (*citing* 29 U.S.C. §§ 203(m), 206(a)(1); 12 N.Y.C.R.R. § 146-1.3(b)

drivers of any changes to their rate of pay and which were signed by the drivers.  Go New York has produced hundreds of these documents as well.[18]

**Second**, Plaintiffs' claim that Go New York violated N.Y. Lab. Law § 195(3) by failing to provide drivers with wages statements listing the dates of work covered by that payment of wages, the name of the employee, the address and phone number of the employer, the rates of pay, the number of hours worked, gross wages, deductions and allowances is false.  *See* Am. Compl. at Ex. I, ¶¶ 35, 71-72.  Go New York has produced documents that wholly refute this claim.  These documents include weekly pay stubs provided to the drivers from 2013 to April 16, 2017, which is the date that SPLI took over all payroll responsibilities.[19]  Go New York's weekly pay stubs set forth each and every one of the foregoing categories of information required by N.Y. Lab. Law § 195(3).  *See e.g.* Alvarado Paystubs annexed to his Affidavit submitted to Court at Ex. J; Falquez at Ex. OO, GONY00017-28.   Accordingly, this claim is false, and was false when made.

**Third**, there is simply no evidence to support plaintiff's boilerplate spread of hours claim.  *See* Am. Compl. at Ex. I, ¶ 2, 56, 60 (*citing* 12 N.Y.C.R.R. § 142-2.4 which requires employers to pay employees who work more than ten hours in a day for one additional hour at the minimum statutory wage rate).  As previously stated, it would be a safety hazard for drivers to work more than ten hours a day, and there is no proof that any driver that worked more than ten hours a day was not paid appropriately.

---

18 *See, e.g.* Notice of Payment Schedule and Policies Effective September 2, 2013 signed by Andrew Wong on January 24, 2014, GONY017996; Notice of Payment Schedule and Policies signed by Mr. Wong on March 7, 2014, GONY017984; Notice of Payment Schedule and Policies signed by Mr. Wong on December 13, 2014, GONY018003
19 Go New York also voluntarily obtained and produced pay stubs and W-2 forms from SPLI for April 17, 2017 through to the present.

**Fourth**, there is no evidence to support Plaintiffs' claim that Go New York failed to comply with laws requiring it to post wage and hour and workers' rights notices for its employees. *See* Am. Compl. at Ex. I, ¶¶ 36, 49, 63.  In fact, the evidence establishes that Go New York posted these notices from the company's inception to the present, and drivers testified that they recalled seeing them. *See* Atkinson Tr. at Ex. AA, p. 107, line 22 – p. 111, line 2; Stewart Dep. at Ex. DD, p. 67, line 20 – p. 68, line 2; p. 109, line 17 – p. 110, line 20 (testifying that there was a bulletin board that posted notice of workers' rights and that it was bigger than his "TV setup" visible during his deposition conducted by Zoom).

## VII.   UNDER THE DOCTRINES OF UNCLEAN HANDS AND LACHES, CLASS MEMBERS WHO REQUESTED CASH PAYMENTS FOR OVERTIME AS A SUBSTITUTE FOR TIME AND A HALF PAYMENTS BY CHECK SHOULD NOT BE PERMITTED TO DEMAND ADDITIONAL COMPENSATION FOR OVERTIME

This case presents a unique circumstance – members of the class for a short period of time from 2013-2014 willingly received payments for overtime in cash.  Many class members preferred to be paid in this manner, it may have been improper for the company to provide those payments and for the drivers to willingly receive them.  However, having willingly accepted cash payments as a substitute for payment of time and one/half by check, the class members as a matter of equity should not be permitted to come into this Court and seek additional compensation. *See Wecare Holdings, LLC v. Bedminster Int'l Ltd.*, 2009 WL 604877, at *11–12 (W.D.N.Y. Mar. 9, 2009) ("application of the unclean hands rule is appropriate 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party'") (quoting *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996); *C.C.S. Communication Control, Inc. v. Sklar*, 1987 WL 12085, at * (S.D.N.Y. June 2, 1987) ("[Plaintiff] attempted to perpetrate a fraud upon the Court in order to obtain an injunction which would put Sklar, his

competitor out of business and destroy him financially.  Having committed perjury, plaintiff cannot expect to obtain an equitable remedy from this Court.").

## VIII. THE ZELLER FIRM'S EXTENSIVE MISCONDUCT WARRANTS SANCTIONS PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. SECTION 1927

The Zeller Firm's misconduct in this case dates back to when they commenced the action in 2015.  Discovery has made clear that they failed to reasonably investigate the veracity and accuracy of Plaintiffs' claims prior to commencing this action.  *See Collins v. Daniels*, 916 F.3d 1320, 1321 (10 Cir 2019) (FRCP 11(b) "imposes … an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing") (*citing Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 553, 551 (1991).  Belief alone cannot form the foundation for a lawsuit.  An "empty-head" but "pure-heart" is no justification for patently frivolous arguments or grossly exaggerated factual assertions.  *Collins*, 916 F.3d at 1319.  The belief must be a "substantiated belief".  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 394 (1990). *See also Int'l Shipping Co. S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir)., *cert. denied,*

If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious.  That is what has happened in this case, and it is for this reason that the sanctions sought by Defendants' motion are warranted.[20]

---

20 *See Margo v. Weiss*, 213 F.3d 55, 64-65 (2d Cir. 2000) (affirming District Court's award of attorneys' fees against plaintiffs' counsel and awarding double costs on appeal to defendants because "[i]t was objectively unreasonable for plaintiffs' counsel to file affidavits, delayed deposition errata sheets and supplemental interrogatory answers in which the plaintiffs contradicted their earlier deposition testimony and interrogatory answers"); *Mintz & Gold LLP v. Daibes*, No. 15 Civ. 1218, 2015 WL 2130935, at * 13 (S.D.N.Y. May 6, 2015) (imposing sanctions upon counsel that filed frivolous notice of removal and defending the notice after the frivolous had been brought to his attention).  *See also In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) (awarding attorneys' fees and stating "[w]hen an attorney recklessly creates needless costs the other side is entitled to relief. Rule 11 was amended in 1983 to make it easier for a court to award fees, indeed to perhaps make the award mandatory in some cases) (*citing Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253-54 & n. 7 (2d Cir. 1985)).

In this case, the proof establishes that the Zeller Firm:

    (a) prepared and caused drivers to sign written Affidavits that contained gross exaggerations and falsehoods regarding the amount of hours worked;

    (b) conducted essentially no independent investigation to verify the amount of overtime alleged in the Affidavits, purporting to rely exclusively on oral statements by drivers;

    (c) made no efforts to collect information in drivers' possession that would have shown actual hours worked drivers,

    (d) provided no instructions to drivers concerning their duty to preserve relevant evidence;

    (e) alleged ongoing wage and hour violations even after knowing that after Go New York installed a time clock, and after Go New York retained SPLI, Go New York fully complied with wage and hour laws, thereby vexatiously demanding discovery for time periods after 2014 for which there was no basis other than pure speculation for claiming wage and hour violations;

    (f) repeatedly refusing Go New York's offer to make drivers whole for the wage violations from 2013-2014, including penalties, and instead pursuing reckless and wasteful claims for time periods after Go New York took reasonable steps to assure compliance with law.

Had the Zeller Firm conducted even a cursory investigation to obtain documents and information in possession of their clients, such as the written notes they provided to the Company concerning hours worked, their text messages with supervisors and managers showing their schedules and hours worked, and their e-mails and text messages with family members, they could not have possibly allowed drivers to execute the Affidavits, Instead, the Zeller Firm encouraged and induced the drivers to sign Affidavits containing numerous preposterous allegations concerning amounts of hours worked and other matters. The conduct of the Class Representatives and the Zeller Firm in this regard, and throughout this case, has been shameful.[21]

---

[21] It is worth noting here that the Zeller Firm and Alvarado have clearly schemed to assert these same claims against multiple tour bus operators in New York. Indeed, less than a week before filing this case, Alvarado as Class

In fact, in violation of their obligations of officers of the Court, the Zeller Firm has even continued to pursue claims on behalf of a Plaintiff that lied about receiving settlements covering the claims at issue in this case. *See* Rule 56.1 St., ¶¶ 155-163.

The Zeller Firm has a long history of professional misconduct. In fact, this is not the first time that the Zeller Firm was caught engaging in fraudulent and sanctionable conduct. In 2017, this Court found that the same attorneys in this case, Brandon Sherr and John Gurrieri of the Zeller Firm, had purposely engaged in tactics in an FLSA case "in order to receive an unreasonably high award of attorneys' fees" and that Attorney Sherr appeared to have spent billed hours "pursuing counsels' own interests" instead of their clients. *See Rodriguez-Hernandez v. K Bread & Co.*, Index No. 15-cv-6848, 2017 WL 2266874, at *1, 6. (S.D.N.Y. May 23, 2017). In yet another case in 2017, this Court found that the Zeller Firm, and particularly Attorney Brandon Sherr, had engaged in egregious misconduct in a wage and hours case by trying to settle a case on behalf of a dead client without disclosing that his client was dead. *See Mok v. 21 Mott St. Restaurant Corp.*, Index No. 14-cv-8081 (PKC), 2017 WL 3981308 (S.D.N.Y. Sept. 8, 2017). The Court stated that Attorney Sherr ". . . knew full well that his client had not testified at a deposition, that his client had peculiar knowledge of the hours that he had worked and that disclosure of the death would have materially affected the value of the claim . . ." *Id.* at *3. The Court expressly held that Attorney Sherr "acted in subjective bad faith and that he unreasonably and vexatiously prolonged the proceedings" in that case. *Id.* at *4. As a result, pursuant to 28 U.S.C. § 1927, the Court ordered Attorney Sherr to pay a $3000 sanction

---

Representative and the Zeller Firm filed a matter against another double-decker tour bus company called Taxi Tours which was captioned *Balderramo v. Taxi Tours Inc., et al*, 15-cv-02181. In the Taxi Tours case, Taxi Tours had insurance coverage and, as a result, Alvarado and the Zeller Firm were able to obtain a quick settlement of $100,000.00. *See* Settlement Agreement at Ex. TT to Rule 56.1 St. They kept the entire $100,000.00 for themselves and did not share any amount with the other drivers that they purported to represent, including drivers that Alvarado knew were not paid for overtime. Alvarado Tr. II at Ex. NN, p. 60, line 13-p. 70, line 3

as well as "defendants' legal fees . . .from the date of misconduct, i.e. when Sherr had a duty to

disclose but did not . . .[because] all fees from that date are causally related (and not merely

temporally relating to the sanctionable conduct." *Id.* at *5 (*citing Virginia Properties, LLC v. T-

Moble Ne. LLL*, 865 F.3d 110 (2d Cir. 2017).   The same exact circumstances exist here and

warrant even more serious sanctions.

Accordingly, not only should they be denied attorneys' fees in this case, they should also

be sanctioned pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. Section 1927.   These sanctions

should include, but by no means limited, to the unnecessary fees and costs expended by Go New

York and Mr. Kostadinov to defend false claims over the course of six years.

Rule 11(b)(3) of the Federal Rules of Civil Procedure provides:

> By presenting to the court a pleading, written motion, or other paper--whether by
> signing, filing, submitting, or later advocating it--an attorney or unrepresented
> party certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances . . . the factual
> contentions have evidentiary support or, if specifically so identified, will likely
> have evidentiary support after a reasonable opportunity for further investigation or
> discovery.

Rule 11 thus "explicitly and unambiguously imposes an affirmative duty on each attorney

to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Eastway*

*Const. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir. 1985), *superseded on other*

*grounds by rule*.   Likewise, under 28 U.S.C. Section 1927, federal courts may exercise their

inherent power to sanction an attorney or party that has "acted in bad faith, vexatiously,

wantonly, or for oppressive reasons." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013).

The egregious misconduct of the Zeller Firm in this case should result in both dismissal of the

claims and an award of the entirety of Go New York's attorneys' fees and costs.

## CONCLUSION

Based on the foregoing, Defendants Go New York and Asen Kostadinov respectfully ask

this Court to enter an Order

(i)     pursuant to Fed. R. Civ. P. 56(a) for dismissal of Plaintiffs' claims;

(ii)    pursuant to Fed. R. Civ. P. 11(c)(2) for sanctions including, but not limited
        to, summary judgment dismissal of this case, costs, attorneys' fees, and
        other sanctions based upon Plaintiffs' and Plaintiffs' counsel's submission
        of false pleadings, affidavits, and other false representations made by
        Plaintiffs and their counsel to this Court;

(iii)   pursuant to 28 U.S.C. § 1927 and the inherent power of this Court for
        sanctions against Plaintiffs and their counsel including, but not limited to,
        costs, expenses and attorneys' fees incurred by Defendants for more than
        six years of litigation on the ground that they have multiplied these
        proceedings unreasonably and knowingly and intentionally pursued
        vexatious litigation;

and such other and further relief as this Court may deem just and appropriate given the years of

vexatious litigation and misconduct by Plaintiffs and their counsel in this case.

Dated: New York, New York
       March 1, 2022

BARTON LLP

By:_____
       Maurice N. Ross (MR 6852)
       Laura-Michelle Ross (LR 7799)

711 Third Avenue, 14th Fl.
New York, New York 10017
(212) 687-6262
mross@bartonesq.com
lmhorgan@bartonesq.com

*Attorneys for Defendants*
*GO NY TOURS INC. and*
*ASEN KOSTADINOV*