**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

VICTOR H. ALVARADO BALDERRAMO and
LUIS FALQUEZ, Individually and on behalf of all
other persons similarly situated,

                    Plaintiffs,

    -against-

GO NEW YORK TOURS INC. and ASEN
KOSTADINOV, jointly and severally,

                  Defendants.

15-cv-02326
(ER) (DF)

---

## DEFENDANTS GO NEW YORK TOURS INC. AND ASEN KOSTADINOV'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Defendants Go New York Tours, Inc. ("Go New York") and its President and owner, Asen Kostadinov ("Kostadinov") (collectively "Defendants"), submit this Statement of Material Facts Pursuant to Rule 56 (c)(1), Local Civil Rule 56.1, and Paragraph 2(C) of the Individual Practices of Judge Edgardo Ramos in support of Defendants' motions:

    (i)      pursuant to Fed. R. Civ. P. 56(a) for dismissal of Plaintiffs' claims;

    (ii)     pursuant to Fed. R. Civ. P. 11(c)(2) for sanctions including, but not limited to, summary judgment dismissal, costs, attorneys' fees, and other sanctions based upon Plaintiffs' and Plaintiffs' counsel's submission of false pleadings, affidavits, and other false representations to this Court vexatious pursuit of boilerplate claims without conducting reasonable investigations;

    (iii)    pursuant to 28 U.S.C. § 1927 and the inherent power of this Court for sanctions against Plaintiffs and their counsel including, but not limited to, costs, expenses and attorneys' fees incurred by Defendants during more than six years of litigation on the ground that they have multiplied these proceedings unreasonably and knowingly and intentionally pursued vexatious litigation; and

(iv)     such other and further relief as this Court may deem appropriate.

For the reasons set forth in Defendants' Memorandum of Law and herein, Defendants' motion should be granted.

The following are material facts as to which there is no genuine issue to be tried:

**I.      *Background of Proceedings***

1.      On March 27, 2015, the Law Office of Justin A. Zeller, P.C. (hereinafter the "Zeller Firm") commenced this action on behalf of Plaintiff Alvarado as a former tour bus driver for Go New York and on behalf of all similarly situated employees alleging that they were entitled to unpaid minimum wages, overtime, spread-of-hours pay, and uniform maintenance fees under the Fair Labor Standards Act ("FLSA") and New York Labor Laws ("NYLL").  A true and correct copy of the Complaint filed on March 27, 2015, ECF Doc. No. 1 (hereinafter the "Complaint"), is annexed hereto as **Exhibit A**.

2.      Less than a week earlier, on March 23, 2015, the Zeller Firm and Alvarado filed a Complaint against another double-decker tour bus company that Alvarado worked for, Taxi Tours Inc. d/b/a Big Taxi Tours ("Taxi Tours") and its owner, which was captioned *Balderramo v. Taxi Tours Inc., et al*, 15-cv-2181.  The same general FSLA and NYLL claims are alleged against both Taxi Tours and Go New York.  The Complaint against Go New York was signed by the same three attorneys from the Zeller Firm: John M. Gurrieri, Esq., Brandon D. Sherr, Esq., and Justin A. Zeller, Esq.  A true and correct copy of the Complaint filed on March 23, 2015, ECF Doc. No. 1 (hereinafter the "Complaint"), is annexed hereto as **Exhibit B**.

3.      Plaintiffs' Complaint against Defendants states that Plaintiff Alvarado worked for defendants "approximately from August 2013 until February 2014". (*Id.*, ¶ 17.)   The Complaint further states that Mr. Alvarado:

> "*worked for the defendants approximately between one hundred fourteen and one-half and one hundred twenty-one and one-half hours per week*", and

> "*worked for the defendants between fifteen and one-half and eighteen and one-half hours per day*."

*Id.*, ¶ 19.    (Emphasis added.)

4.      On May 28, 2015, another tour bus driver, Luis Falquez, filed a notice of consent to become party plaintiff under the FLSA (*See* ECF Doc. No. 4.)

5.      Defendants filed an Answer on June 18, 2015 and asserted multiple affirmative defenses.  A copy of Defendants' Answer, filed on June 18, 2015, ECF Doc. No. 11, is annexed hereto as **Exhibit C**.

6.      An initial pretrial conference was held on September 3, 2015, and the parties entered into a discovery plan and scheduling order pursuant to which discovery was to be completed over five years ago, by May 6, 2016.  *See* ECF Doc. No. 13.

7.      On December 31, 2015, Defendants served Defendants' First Request for the Production of Documents to Plaintiffs (hereinafter the "First Document Request"), a copy of which is annexed hereto as **Exhibit D**.

8.      In the First Request for Documents, Defendants requested documents relating to the total hours worked by Plaintiffs, all compensation received by Plaintiffs (including bonuses), and Plaintiffs' alleged unpaid wages.  *Id.*, Reqs. Nos. 6, 7, 9, 10, 11, 12, 13, 18, 19, 20, 21, 24, and 25.

9.      In the First Request for Documents, Defendants specifically requested "[a]ll documents, excluding the Complaint, setting forth Plaintiff's version of events that form the basis of his claims therein, including but not limited to ***diaries, logs, memoranda, notes, notebooks or other documents***." *Id.*, Req. No. 20. (Emphasis added.)

10.     Defendants also specifically requested all documents reflecting communications between Plaintiff and Go New York's directors, administrators, employees or representatives" regarding his employment, wages, and the hours that Plaintiff worked each week from August 2013 through February 2014. *Id.*, Reqs. Nos. 7, 8, 9, 13, 15, 16, 17 and 18.

11.     Plaintiff objected to nearly all of the requests in the First Request for Documents. *See* Plaintiff's Response to Defendants' Request for Production of Documents, dated February 2, 2016, a copy of which is annexed hereto as **Exhibit E.**

12.     Defendants issued three subsequent requests for documents, copies of which are annexed hereto as **Exhibits F, G, and H**.

13.     On January 22, 2016, Plaintiffs filed the First Amended Complaint, which added Luis Falquez as a plaintiff, and asserted amended factual allegations regarding Mr. Balderramo's hours.  (A copy of the First Amended Complaint filed on January 22, 2016, ECF Doc. No. 16, hereinafter the "Amended Complaint", is annexed hereto **Exhibit I**.  The Amended Complaint states that Mr. Alvarado:

> "***worked for the defendants approximately between seventy and eighty-seven hours per week***" and
>
> "***worked for the defendants a spread of hours greater than ten approximately six days per week.***"

*Id.*, ¶ 19.  (Emphasis added.)   Attorney Gurrieri from the Zeller Firm signed the Amended Complaint.

14.     Also, on January 22, 2016, Plaintiffs moved to conditionally certify this case as a collective action (hereinafter "Motion to Conditionally Certify Class").  *See* ECF Doc. No. 18-22.

15.     In support of Plaintiffs' Motion to Conditionally Certify Class, Plaintiffs filed the Affidavit of Victor H. Alvarado Balderramo in Support of Motion to Conditionally Certify Collective Action, sworn to on October 6, 2015, and notarized by Attorney Gurrieri (the "Alvarado Affidavit") (*see* ECF Doc. No. 19), a copy of which is annexed hereto as **Exhibit J**. Mr. Alvarado states as follows:

> *"The defendants employed me approximately from August 2013 until February 2014.  I was on vacation and not working for the defendants approximately between the middle of December 2013 until February 2014."*
>
> *"I worked for the defendants approximately six days per week and between seventy and eighty-seven hours per week, except for two weeks where I only worked five days per week and worked between fifty-five and sixty-five hours per week."*

Alvarado Aff., ¶¶ 2, 4.  (Emphasis added.)

16.     Inexplicably, the 114 ½ to 121 ½ hours Alvarado claimed to have worked in the original Complaint (*see* Ex. A, ¶ 19) were reduced to 70 – 87 hours a week in the Amended Complaint and his Affirmation in support of certification (*see* Ex I, ¶ 19; Ex. J, ¶ 4).

17.     In support of Plaintiffs' Motion to Conditionally Certify Class, Plaintiffs also filed the Affidavit of Plaintiff Luis Falquez in Support of Motion to Conditionally Certify Collective Action, sworn to on November 9, 2015, and notarized by Attorney Gurrieri (the "Falquez Affidavit") (*see* ECF Doc. No. 20), a copy of which is annexed hereto as **Exhibit K**.  Mr. Falquez states as follows:

> *"[w]ith the exception of approximately three weeks, I worked for the defendants approximately between eleven and thirteen hours per day approximately five days hours [sic] per week".*
>
> *"[t]he defendants promised to pay me $13.00 per hour.   The defendants paid me approximately $13.00 per hour for the hours I worked up to forty per week and approximately no wages for the hours I worked for the defendants over forty per week."*

*Id.*, ¶¶ 4, 5, 6.  (Emphasis added.)  There are no pay stubs or other proof of the hours he claims to have worked attached to the Falquez Affidavit.  *Id.*

18.     On November 25, 2016, Plaintiffs moved to certify the class, made a second motion to conditionally certify collective action on behalf of tour guides, and to extend the time to consent to become a party plaintiff (hereinafter the "Motion to Certify Class").  *See* ECF Doc. No. 66-87.  The Notice of Motion was executed by Attorney Sherr on behalf of the Zeller Firm. *See* ECF Doc. No. 66.  Plaintiffs obtained three extensions of time to file this motion to obtain affidavits from "newly opted-in plaintiffs".  *See* ECF Docs. Nos. 55, 59, 64.

19.     In support of the Motion to Certify Class, Attorney Sherr submitted an Affirmation, sworn to on November 25, 2016 (ECF Doc. No. 68), a copy of which is annexed hereto as **Exhibit L**.  In his Affirmation, Attorney Sherr stated that the Zeller Firm was "willing and able to commit the necessary resources to represent the class in this case." *Id.*, ¶ 9.  Attorney Sherr also stated that "plaintiffs have obtained payroll records regarding their case against the defendants."  *Id.*, ¶ 10.  Attorney Sherr also affirmed "that both Alvarado and Falquez stated that they were willing to be class representatives and to protect the interests of the class".  *Id.,* ¶ 2.

20.     In support of the Motion to Certify Class, the Zeller Firm also resubmitted the Alvarado Affidavit (*see* Ex. J, refiled as ECF Doc. No. 69) and the Falquez Affidavit (*see* Ex. K, refiled as ECF Doc. No. 73).

21.     The Zeller Firm also filed 15 new Affidavits from drivers in support of the new Motion to Certify Class including: (i) the Affidavit of Plaintiff Lawrence Atkinson in [*sic*] Motion to Certify Class, sworn to on August 19, 2016, and notarized by Attorney Gurrieri ("Atkinson Affidavit") (*see* ECF Doc. No. 70), a copy of which is annexed hereto as **Exhibit M**; (ii) the Affidavit of Plaintiff Lionel Briggs in Support of Motion to Certify a Class, sworn to on September 8, 2016, and notarized by Attorney Gurrieri ("Briggs Affidavit") (*see* ECF Doc. No. 71), a copy of which is annexed hereto as **Exhibit N**; (iii) the Affidavit of Plaintiff William T. Steward in Support of Motion to Certify a Class, sworn to on September 23, 2016, and notarized by Attorney Gurrieri ("Steward Affidavit") (*see* ECF Doc. No. 83), a copy of which is annexed hereto as **Exhibit O**; (iv) the Affidavit of Plaintiff Andrew Wong in Support of Motion To A Class [*sic*], sworn to on October 24, 2016, and notarized by Attorney Gurrieri ("Wong Affidavit") (*see* ECF Doc. No. 83) ), a copy of which is annexed hereto as **Exhibit P**.  There were no pay stubs or other proof of the hours Plaintiffs Atkinson, Briggs, Steward, or Wong claims to have worked attached to their Affidavits.  (*Id.*, Exs. M, N, O, P.)

22.     Over the next few months, more than twenty additional individuals filed to become plaintiffs in the lawsuit and designated the Zeller Firm as their attorneys in this case and designated Alvarado and Falquez as their class representatives. *See, e.g.,* ECF Docs. Nos. 39-53, 54, 57, 58, 63, 100.

23.     Defendants answered the Amended Complaint on June 6, 2019 and asserted affirmative defenses that included waiver, estoppel, laches, release, accord and satisfaction.  (*See* ECF Doc. No. 118.)  A copy of Defendants' Answer to the Amended Complaint is annexed hereto as **Exhibit Q.**

24.     On June 28, 2017, the Court issued an Opinion and Order in which it granted Plaintiffs' Motion to Certify a Class pursuant to Fed. R. Civ. P. 23. (*See* Opinion and Order, filed on June 28, 2017, ECF Doc. No. 104, a copy of which is annexed hereto as **Exhibit R** (the "Class Certification Order").)

25.     In granting class certification, the Court relied upon the false claims that the Zeller Firm and Plaintiffs Alvarado, Falquez and other drivers made in their submissions to the Court concerning the number of overtime hours work and Go New York's alleged failure to make payments for overtime work. The evidence exchanged during discovery establishes indisputably that the hours the drivers claimed to have worked for Go New York were vastly exaggerated. *See infra*, ¶¶ 84-94. In depositions, the drivers themselves admitted this. *Id.*

26.     Based upon the misrepresentations of Messrs. Alvarado and Falquez and the Zeller Firm, the Court found that Plaintiffs satisfied the requirements for class certification, including commonality and typicality. *Id.*, pp. 6-8.

27.     After the Court's Class Certification Order, there was no docket activity ***for nearly two years*** from June 28, 2017 to April 2, 2019. In the interim, Go New York and Mr. Kostadinov retained this firm to assume their defense of this action, replacing a prior law firm.

28.     On April 2, 2019, the Court *sua sponte* directed the parties to submit a joint status report no later than April 16, 2019. *See* Order at ECF Doc. No. 105. Plaintiffs' counsel failed to comply with the Court Order and, as a result, the Court terminated the case "for failure to prosecute and failure to comply with a court order" on April 24, 2021. *See* Order at ECF Doc. No. 107.

29.    It was not until after the Court terminated the case that Attorney Gurrieri filed a one-page letter motion by Plaintiffs to reopen the case, which was granted. *See* ECF Doc. No. 109. The Court also ordered the parties to attend a status conference on May 22, 2019. *Id.*

30.    After the Court prompted the Zeller Firm to resume prosecution of this case, Plaintiffs and their attorneys began to conduct discovery in an effort to find proof that would support the boilerplate claims that they alleged at the outset of the case, without having conducted any reasonable investigation concerning the plausibility of such claims.

31.    Go New York produced a total of 23,072 pages of documents in response to Plaintiffs' requests.

32.    Plaintiffs deposed several Go New York witnesses.

33.    A true and correct copy of the deposition of Asen Kostadinov, conducted by Zoom on June 29, 2021 is annexed hereto as **Exhibit S**.

34.    A true and correct copy of the deposition of Eduard Baran, conducted by Zoom on June 30, 2021 is annexed hereto as **Exhibit T**.

35.    A true and correct copy of the deposition of Yulia Kostadinova, conducted by Zoom on September 28, 2021 is annexed hereto as **Exhibit U**.

**II.    *Plaintiffs' Counsel Has Had Ample Notice of a Rule 11 Motion.***

36.    After pre-motion applications by the parties, this Court held a motion conference by telephone on June 9, 2021.  The Court granted Defendants' application to make a motion for summary judgment and Rule 11 sanctions pursuant to Fed. R. Civ. P. 11.

37.    Defendants filed Motions for Summary Judgment, Rule 11 Sanctions and, Alternatively, to Compel Production From Plaintiffs and Disqualify Class Counsel and the Class Representatives on August 2, 2021. *See* ECF Docs. Nos. 263-65.  Plaintiffs opposed the motion

and filed a cross-motion seeking summary judgment on several affirmative defenses on August 6, 2021 (ECF Doc. No. 275) and Defendants filed a reply on August 18, 2021 (ECF Doc. No. 293). Thereafter, the motion remained *sub judice*. At no time did Plaintiffs withdraw or correct their false allegations to the Court as identified in Defendants' Motion for Summary Judgment and Rule 11 Sanctions.

38.     On January 24, 2022, Magistrate Judge Freeman issued an Order requesting that the parties submit an updated status report regarding the potential for settlement of the action at this time and indicating whether the parties believe that a settlement conference would be helpful at this time. On June 25, 2022, the parties filed a joint status letter stating that Defendants would be seeking to obtain sanctions and attorneys' fees against Plaintiffs and their counsel. *See* ECF Doc. No. 345.

39.     Just a few days before the end date for discovery, Plaintiffs filed a pre-motion letter seeking leave to file a motion to amend their Amended Complaint to add the wife of Defendant Asen Kostadinov, Yulia Kostadinov, as a party to the action. *See* ECF Doc. No. 346. Incredibly, Plaintiffs submitted with their letter a draft Amended Complaint that repeated each and every one of the representations that Defendants identified as false in their prior Motion for Summary Judgment and Rule 11 Sanctions.   A copy of the proposed Second Amended Class Action Complaint and Jury Demand is annexed hereto as **Exhibit V**. *See also*  ECF Doc. No. 346-1. Defendants opposed the motion and restated its intention to seek Rule 11 sanctions based upon Plaintiffs' misconduct and false representations to the Court. *See* ECF Doc. No. 348.

40.     On February 4, 2022, the Court held a telephone conference with the parties. The Court denied Plaintiffs' application to amend their Amended Complaint to add Mr. Kostadinov's wife as a party to this action. The Court also advised the parties that discovery was closed. The

Court advised the parties that the pending motions for summary judgment would be deemed moot and set a new briefing schedule of motions for summary judgment and Defendants' renewed motion for Rule 11 sanctions. Following the call, the Court issued an Order stating that the parties' prior summary judgment motions and Defendants' Rule 11 motion were moot. *See* Order at ECF Doc. No. 350.

### III.    *Defendants Have Made Numerous Attempts to Resolve This Matter By Making the Drivers Whole For the Limited Period of Time That They Were Not Paid the* ***Time and a Half Rate for Overtime.***

41.    From the beginning of this case, Go New York has admitted that in the early years of its operations, in 2013 to 2014, the company failed to pay tour bus drivers time and a half for overtime. Instead, Go New York paid drivers the straight pay hourly rate for overtime in cash, and not the time and a half rate to which they were entitled pursuant to the FLSA and NYLL.

42.    On multiple occasions, Go New York has offered to pay Plaintiffs the difference between drivers' regular rate and the time and a half rate for the overtime hours for this limited time period.

43.    Go New York also offered to make plaintiffs whole by proposing to settle the case for $60,000 which would include unpaid overtime totaling about $14,000 and potential statutory penalties. The Zeller Firm rejected this offer and instead, declared war on Go New York, engaging in a fishing expedition to use the discovery process to uncover additional wage and hour violations. That fishing expedition failed, and no evidence has been adduced of wage and hour violations other than the unpaid overtime for drivers during the years 2013-2014.

44.    On May 22, 2019 the Court held a status conference and thereafter issued an Order Referring the Case to Magistrate Judge for settlement discussions and a Scheduling Order. *See* ECF Docket Entries Nos. 115-117.

45.     On June 12, 2019, a Settlement Conference was held with Magistrate Judge Freeman. *See* Pacer Docket. In advance of the settlement conference, Go New York calculated the total amount due to drivers and produced this information to Plaintiffs' counsel, the Law Firm of Justin A. Zeller, P.C. (the "Zeller Firm"). Even with supporting backup, Plaintiffs and the Zeller Firm rejected Go New York's offer to make the drivers whole. They did so solely to use the discovery process as a fishing expedition to provide evidentiary support for the boilerplate claims in their pleadings, and thereby justify an award of attorneys' fees.

46.     At his deposition, the President of Go New York, Kostadinov, testified: "Q: Have you ever offered to pay drivers back the one-and-a-half time overtime that they were due for the period prior to October 6, 2014? A: We offered, yes." *See* Kostadinov Tr. at Ex. S, p. 188, line 23 – p. 189, line 3.

### IV. *Go New York's Operations.*

#### A. *The First Years of Go New York's Operations (2011 – October 2014).*

47.     Go New York operates a fleet of "hop-on, hop-off" double-decker sightseeing tour buses serving tourists in New York City under the brand name "TopView". *See* Affidavit of Asen Kostadinov, sworn to on April 19, 2021, a true and correct copy of which is annexed hereto as **Exhibit W**, ¶ 1.

48.     Hop-on, hop-off sightseeing tour buses travel routes through areas of interest to tourists who can "hop-off" a bus at a place or attraction of interest to them, and then "hop-on" another bus of the same company to continue their tour. *See* Affidavit of Eduard Baran, sworn to on June 2, 2021, a true and correct copy of which is annexed hereto as **Exhibit X**, ¶ 2. Go New York's tours begin in Midtown Manhattan from a stop located at 49th Street between Fifth and Sixth Avenues every day of the week. *See* Kostadinov Tr. at Ex. S, pp. 121-24.

49.     Go New York was founded by its President, Asen Kostadinov, in January 2011 when he was around 27 years old. *See* Kostadinov Tr. at Ex. S, p. 6, line 22 – p. 7, line 1.  Mr. Kostadinov emigrated to the United States from Bulgaria. *Id.*

50.     When Mr. Kostadinov formed the company in 2011, it owned two double-decker tour buses for only a few hours a day.  Kostadinov testified that "[w]hen we first started, August of 2012, we only had sometimes, even one bus only for the day."  Kostadinov Tr. at Ex. S, p. 121, lines 20-25.  By 2012, Go New York only had four double-decker tour buses. *Id.*, p. 20, line 18 – p. 21, line 6.

51.     Go New York's annual gross sales did not exceed $500,000.00 until 2013. *See* Kostadinov Aff. at Ex. X, ¶ 2.  In 2013, Go New York only had five to six double-decker tour buses, and it ran limited tours, sometimes as few as one tour per day. *See* Baran Tr. at Ex. T, p. 27, lines 19-22.  It also had very few employees. *See* Baran Aff. at Ex. X, ¶ 4 (stating that he began working as a cashier for Go New York in 2013 and that, at that time, "[t]here were approximately five or six other employees that worked with [him] in the of Go New York was still a small company with less than 30 employees that operated approximately five tour buses").

52.     The company had an office located at 218 West 37th Street, 5th Floor, New York, New York 10018. *See* Baran Aff. at Ex. X, ¶ 4. Starting at 7:00AM, the cashiers working in the office, including Mr. Baran, would start checking in ticket sellers who came into the office to pick up their devices to sell tickets and make sure that the devices were working. *Id.*, ¶ 5. The ticket sellers would then go out onto the streets to sell tickets for the bus tours.  No tickets were sold before 7:00AM. *Id.*

53.     Go New York also has a bus yard located on Onderdonk Avenue, Brooklyn, New York. In 2013 to 2014, there were approximately five to six people that worked at the bus yard including mechanics, a drivers' manager, and supervisors. *Id.,* ¶ 6.

54.     Since the company was formed and through to today, bus tours usually did not begin until 9:00AM, and never before 8:00 a.m. *See* Kostadinov Dep. at Ex. S, pp. 121-22; Baran Aff. at Ex. X, ¶ 7.

55.     In 2013 to 2014, The Company's bus yard did not open until 7:00AM, or a few minutes before 7:00AM, each day. *See* Baran Aff. at Ex. X, ¶ 7; Baran Tr. at Ex. T, pp. 52-53. The yard would be opened at 7:00AM by a mechanic, a supervisor or a driver's supervisor named John Littlejohn (called "Troop" by the drivers). *Id.* Bus drivers would arrive at the bus yard to start their shifts no earlier than 7:30 a.m. and usually between 8:00 and 8:30 a.m.. *Id.*

56.     The drivers that were deposed gave conflicting testimony on the issue of when the bus yard opened. *See, e.g.,* Deposition of Lionel Briggs, taken on June 2, 2021 (hereinafter "Briggs Tr."), a true and correct copy of which is annexed hereto as **Exhibit Y**, p. 26, lines 15-20 ("Q: What time did the tours begin? A: The tours, I can't recall; I cannot recall. Morning shift I would say maybe around 9:00AM"); Deposition of Alvarado, taken on April 15, 2021 (hereinafter "Alvarado Tr.") a true and correct copy of which is annexed hereto as **Exhibit Z**, (testifying that he was required to arrive at Go New York's bus yard "at 5:00 a.m. to pick up the bus at 5:10, and then I will drive to Manhattan, and because of the traffic, I will get there at 7:30, and then I will be working until 6:30, and then after I finish work, it will take me two hours to go back to the parking [*sic*] to return the bus").

57.     Drivers' schedules often were conveyed between the Company and employees via text messages. *See* Briggs Tr. at Ex. Y, p. 29, line 13 – 30, line 7. Another driver that was deposed, Lawrence Atkinson testified as follows:

> Q: Did anyone record your time when you finished working, when you finished your tour and returned the bus at the end of the day?
>
> A: Before we – you mean when I got relieved?
>
> Q: Yes, sir.
>
> A: When I got relieved, I didn't see anybody.  Sometimes I would text them and tell them what my end time was.
>
> Q: That's the phone that we discussed, that you had then, and you would use that to text when you were finished?
>
> A: Yeah. …
>
> Q: That procedure that you just described, was that the whole time that you were working for Go New York, or was that just during the early years?
>
> A: It was in the early years before they got the time clocks.

*See* Deposition of Lawrence Atkinson, taken on April 7, 2021 (hereinafter "Atkinson Tr."), a true and correct copy of which is annexed hereto as **Exhibit AA**, p. 49, line 16 – p. 50, line 13.

58.     Since bus tours usually did not begin in the city until 9:00AM (and never before 8:00 a.m.), and the yard was locked until approximately 7:00AM, there would be no reason for a bus driver to report to the bus yard at 5:00AM. Baran Aff. at Ex. X, ¶ 7.  Indeed, he or she would not be able to get into the yard until it was opened two hours later at 7:00AM by a mechanic, manager or supervisor. *Id.*

59.     When drivers arrived at the yard, Mr. Littlejohn or a supervisor would sign the drivers in and assign each of them to a bus. *Id.* The drivers would then inspect the bus and drive it from the bus yard in Brooklyn to the first stop on the tour in Manhattan. *Id.* Mr. Littlejohn

and the supervisors would be in constant contact with drivers about their schedules, assigned routes, and the number of hours that they worked. *Id.*

60.     Drivers would be compensated for the time that they spent driving the bus back from Manhattan to the bus yard in Brooklyn at the end of the day, including any time that they spent refueling the bus for the next morning. *Id.,* ¶ 19. This is confirmed by Mr. Baran's handwritten time sheets. *See* Ex. A to Baran Aff) At his deposition, Mr. Baran was asked the following questions and provided the following responses:

> Q: When you worked at Go New York Tours Inc. before October 2014, were bus drivers being paid for the time that they spent driving the bus from the yard to the tour site?
>
> A: They was getting paid for the travel time, because it was bringing the bus from the yard to the City and from the City to the yard.

Baran Tr. at Ex. T, p. 29, lines 16-25.

61.     Additionally, Mr. Baran testified that Go New York used averages to calculate the pay owed to drivers from driving the bus from the yard to the city and back to the yard because "there were many bus drivers taking advantage – it was not controlled by the driver after they leave the yard or after they're leaving to the City to have average time for the drivers to come from the City back to the yard. I remember there was some driver – I cannot recall his name. I don't remember his name. But I remember that there was some driver that took his bus and kept it at his house for five hours or something like that." *Id.*, pp. 53-54.

62.     Because the Company did not have biometric clocks to keep track of drivers' time until October 6, 2014, the drivers' manager or supervisors would keep track of the daily sign-in and sign-out times for each of the drivers on handwritten sheets. *See* Baran Aff. at Ex. X, ¶ 8; Baran Tr. at Ex. T, pp. 10-11, 15-19, 26-27.

63.     In 2013 to October 2014, Mr. Baran's duties included tallying up the total hours each driver worked that week from the handwritten sheets provided to him by supervisors. *See* Baran Aff. at Ex. X, ¶ 8.  Some drivers also kept track of their hours and would provide their own handwritten sheets of the hours that they worked each day to Mr. Baran. *Id.*; *see also* Baran Tr. at Ex. T pp. 13-14, 18-20.  There was rarely a discrepancy between the hours kept by the managers or supervisors and the drivers' hours. *See* Baran Aff. at Ex. X, ¶ 8

64.     Mr. Baran would then create his own handwritten sheets from the papers he was given by the supervisors and the drivers. *Id.*, ¶ 9.  Go New York has produced hundreds of pages of these sheets that have been authenticated by Mr. Baran.  Indeed, Go New York has even specifically produced Mr. Baran's handwritten time sheets reflecting contemporaneous cash payments to Alvarado (*see* D000029 – 45, true and correct copies of which are annexed hereto as **Exhibit BB**) and Falquez (*see*  D000021, a true and correct copy of which is annexed hereto as **Exhibit CC**).

65.     As reflected by Mr. Baran's timesheets, and as he testified at his deposition, he would calculate the regular hours each driver worked per week up to 40 hours and any overtime hours that the driver worked above the 40 hours.  During this time, drivers would be paid by check for the hours that they worked up to 40 hours a week and in cash at the same rate for any overtime hours that they worked over the 40 hours. *See* Baran Aff. at Ex. X, ¶ 9; Kostadinov Tr. at Ex. S, pp. 112-115; Kostadinova Tr. at Ex. U, p. 58, lines 5-12.  The testimony of several drivers also confirms this. *See, e.g.,* Stewart Aff. at Ex. O, ¶ 8 ("[t]he defendants paid me for my first forty hours per week by check and for the hours I worked above forty in cash")  A driver who worked for Go New York from December 2013 to March 2021, Lawrence Atkinson, confirmed this practice and testified as follows:

Q: When you first started at the company, was there any time – was there any training period where you weren't paid anything for showing up to be trained for the job?

A: No.  I was always paid.

Q: So as soon as you started, you got the $12 an hour, and then it increased to $15 an hour after the first 30 days, right?

A; Yes, ma'am.

Q: How were you paid in those years, the early years?

A: I was paid 40 hours with the check, and the rest was – cash in an envelope.

Atkinson Tr. at Ex. AA, p. 60, lines 7-22.

66.     Another driver who worked for Go New York from March 2013 to January 2014,

William T. Stewart, confirmed this practice and testified as follows:

Q: So your claim is based on the fact that you were not being paid time-and-a-half for the overtime hours?

A: Yes.

Q: How were you paid for the hours you worked overtime?

A: In cash.

Q: Who paid you the cash for overtime?

A: It was attached to our pay stub – our paycheck, sorry.

*See* Deposition of William Stewart, taken on May 28, 2021 ("Stewart Tr."), a true and correct

copy of which is annexed hereto as **Exhibit DD,** p. 28, line 19 – p. 29, line 4.  Mr. Stewart

further testified as follows:

Q: You said they'd give you your check, what were you handed?

A: If you worked overtime, you were handed a white envelope and a yellow envelope.

Q: What would be in the white envelope?

A: Your check or stub.

Q: What would be in the yellow envelope?

A: Cash.

Q: You say check or stub do you mean – what do you mean by that, do you mean direct deposit or you got an actual check that was cashed?

A: If you had a direct deposit, it was just a stub, if you didn't have it it was just the check.

Q: Which did you have?

A: I had direct deposit.

Q: So, did you ever check to see if you had received your direct deposit before you went to pick up your check?

A: No.

Q: Do you know if other drivers received direct deposits?

A: I'm sure they did.

Q: So would drivers – why would a driver go to the office to pick up just a check stub?

A: Because those who had cash had cash right there.

Q: So they would be going to the office to pick up the additional envelope with the cash?

A: That is correct.

*Id.*, p. 95, line 10 – p. 96, line 16.

67.     Mr. Baran's duties at this time included putting drivers' paychecks for the regular hours that they worked and cash for any overtime hours that they worked each week into an

envelope. *See* Baran Aff. at Ex. X, ¶ 13. Drivers could pick up their checks either at the office or the bus yard depending on the shift that they worked and their preference. *Id.*

68.     Mr. Baran testified that he personally put drivers' paychecks for the regular hours that they worked and cash for any overtime hours that they worked into an envelope for each driver in 2013 to 2014. *Id.*, ¶ 13.

69.     Mr. Kostadinov's wife, Yulia Kostadinova, who also worked in the office in the early years of the company's operations, testified that when she helped out in the office, she also would hand the drivers an envelope containing checks and cash for overtime hours when they came into the office. Kostadinova Tr. at Ex. U, pp. 61-74. The cash that was used to pay the drivers was from cash that Go New York had on hand from ticket sales. *See* Baran Aff. at Ex. X, ¶ 14.

70.     Both Mr. Baran and Ms. Kostadinova testified that if a driver opened the envelope containing his paycheck and cash for overtime, and he or she did not believe that they were paid for all of the hours that they worked that week, they would complain to him or her, or other cashiers in the office until they were paid what they claimed to be owed. *See* Baran Aff. at Ex. X, ¶ 18; Kostadinova Tr. at Ex. U, pp. 75-80. Ms. Kostadinova testified as follows:

> [s]ome drivers would come to me and say look, I have this child support, so can they get 40 hours over, can I get it in cash. And because we were in desperate need of drivers, we would agree to it . . . he would get, okay, I get the 40 hours in check. And the rest, you know, I need to get paid in cash. Otherwise I cannot work. And that was the agreement. And they would come, get paid. Be happy with that and sign the receipt that they got paid.

*Id.*, p. 65, lines 3-12.

71.     Until biometric clocks were installed in October 2014, it was Go New York's policy to have the drivers sign receipts for the cash that they received for overtime. *See* Baran

Aff. at Ex. X, ¶ 14.  This was so the drivers could not claim that they were not paid the cash for overtime.  *Id.*

72.     After receiving an envelope with their check and cash payment for overtime, the drivers would then sign receipts confirming that they received a sum certain of cash as payment for their overtime hours that week.  *See* Baran Tr. at Ex. T, pp. 43-44; Kostadinova Tr. at Ex. U, pp. 63-65.

73.     Go New York has produced hundreds of pages of receipts signed by drivers confirming that drivers received a sum certain of cash as payment for their overtime hours that week.   In fact, Go New York has produced receipts signed by Alvarado and Falquez themselves confirming that they did in fact receive cash payments for overtime.   True and correct copies of receipts signed by Alvarado, Bates Nos. D000029 – 45, are annexed hereto as **Exhibit EE.**  A true and correct copy of a receipt signed by Falquez, Bates No. D000021, is annexed hereto as **Exhibit FF**.

74.     Prior to installation of biometric clocks, drivers also received cash bonuses for complying with Company policy.  For example, drivers would receive a bonus of $3.00 per hour for every hour that they worked if they met certain requirements such as no unannounced no-shows, showing up on time, and no accidents.  *See* Baran Aff. at Ex. X, ¶ 16; *see also* Atkinson Tr. at Ex. AA, p. 58, line 9 – p. 59, line 11, p. 105, lines 22-25; Stewart Tr. at Ex. DD, p. 18, lines 7-14.)

75.     Go New York has always provided drivers with notice of the wages that they would be paid in advance.  Indeed, upon hiring, drivers were provided with a hiring packet.  *See* Exhibit C to the Baran Aff. at Ex. X, Bates Nos. D000201-218.  The hiring packet included a

"Go New York Tours Inc. Driver Employment Letter" as well as a "Payment Schedule" which set forth:

> A) Base Hourly Payment - $12.00 per hour,
>
> B) Bonus - $3.00 [if drivers complied with the company policies set forth therein stated below such as no unannounced no-shows and arriving on time for their shift].

*Id.* at D000203. Go New York has produced hundreds of documents confirming this, including forms signed by Party Plaintiff Andrew Wong, true and correct copies of which are annexed hereto as **Exhibit GG** (Bates Nos. GONY017978-84) and by Party Plaintiff Kee Chye Chew, true and correct copies of which are annexed hereto as **Exhibit HH** (Bates Nos. G0NY018194-98).

76.     Additionally, drivers were provided with a copy of Go New York Tours Field and Warehouse Employees' Policy and Procedure Handbook which set forth the manner in which the drivers would be paid. *See, e.g.,* Handbook signed by Falquez on September 26, 2013, a true and correct copy of which is annexed hereto as **Exhibit II** (Bates Nos. D000108-118, at 110-112).

77.     Thereafter, Go New York provided periodic notices advising drivers of any changes to their rate of pay and which were signed by the drivers.  Go New York has produced hundreds of these documents as well. *See, e.g.* Notice of Payment Schedule and Policies Effective September 2, 2013 signed by Andrew Wong on January 24, 2014, GONY017996; Notice of Payment Schedule and Policies signed by Mr. Wong on March 7, 2014, GONY017984; Notice of Payment Schedule and Policies signed by Mr. Wong on December 13, 2014, GONY018003.  True and correct copies of these documents are annexed hereto as **Exhibit JJ.**

### B. *Go New York's Operations (From October 2014 to the Present).*

22

78.     On or about October 6, 2014, Go New York retained a company called Time Force to install biometric clocks for the drivers to punch in and punch out each day. *See* Baran Aff. at Ex. X, ¶ 22. A copy of Go New York's contract with Time Force is annexed to the Baran Affidavit as Exhibit D.

79.     After the time clocks were installed by the Company, the drivers would sign in and out of work using large orange clocks to enter a code and their fingerprints. *See* Baran Aff., ¶ 22. The clocks were kept at the bus yard, the office and at bus stops along the tour routes. *Id.* After the clocks were installed, the drivers were always paid by check time and a half for any overtime hours that they worked. *Id.*

80.     Accordingly, since October 6, 2014, all drivers' time was tracked by biometric time clocks, and they received checks or direct deposits for their full amount of pay, including the time and a half rate for overtime. *See* Baran Aff., ¶ 22. Go New York has produced time records confirming this to Plaintiffs, which are Bates Nos. GONY017958-18997. There is no evidence to the contrary.

81.     In July 2016, the Transport Workers Union Local 100 and Go New York Tours agreed to a Collective Bargaining Agreement, a copy of which is annexed hereto as **Exhibit KK,** (previously produced with Bates Nos. GONY017917 – 33). As set forth therein, Go New York agreed to "recognize[s] the Union as the sole and exclusive bargaining agent for the purposes of collective bargaining with respect to establishing wages, hours, benefits and working conditions for all full time and part time Drivers," among other employees. (*Id.*, Art. 1 at p. 4, Bates Nos. GONY017917 – 33.)

82.     On April 6, 2017, Go New York retained  South East Personnel Leasing, Inc. ("SPLI") to provide employee leasing services to Go New York. A copy of Go New York's

Client Leasing Agreement with SPLI is annexed hereto as **Exhibit LL**.  Pursuant to the SPLI Agreement, SPLI  handles all of the preparation, administration, compilation and filing of all payroll information and distribution of payroll checks to all of Go New York's employees.  From that point on, SPLI has been responsible for the payment of wages, withholding and remittance of federal and state employment taxes, and providing  applicable benefits and legal notices to Go New York employees.  (*Id.*, p. 1.)

83.    On July 1, 2019, a new Collective Bargaining Agreement was entered into by Local 100 and Go New York Tours, a copy of which is annexed hereto as **Exhibit MM**, previously produced with Bates Nos.  GONY17934 – 57.  This agreement remains in effect until January 31, 2023.

*V.    Plaintiffs Grossly Exaggerated The Number of Hours That They Worked For Go New York.*

84.    Deposition testimony of the Class Representatives and other drivers confirms that the Zeller Firm knowingly submitted false affidavits without conducting any meaningful investigation of the truth of the allegations therein.

85.    In the Amended Complaint and Affidavit filed by the Zeller Firm and Alvarado in 2016, the original 114 ½ to 121 ½ hours that Alvarado claimed to work were reduced to between 70 to 87 hours.  *See* Ex. I, ¶ 19; Ex. J, ¶ 4.

86.    At his deposition, Alvarado admitted that his sworn Affidavit was false.  Specifically, he admitted that during the time he worked at Go New York, from August 2013 to February 2014, he did not regularly work between 70 – 87 hours a week for six days a week.  He testified that *"[i]t wasn't all of the weeks that I worked six days.  I would say that an average of four weeks that I worked six days."*  Alvarado Tr. at Ex. Z. p. 155, line 16 – p. 156, line 21. (Emphasis added.)

87.     Alvarado admitted that he had no proof to contradict Go New York's contemporaneous time records showing that he never worked more than 46 hours and 55 minutes in a single week. *Id.*, pp. 155-162.

88.     When Alvarado was confronted with his time records showing that he never worked more than five days a week, and never more than 46 hours and 55 minutes in a single week, Alvarado tried to concoct a story that would explain his blatant misrepresentation to the Court in his Affidavit.  He claimed that he was required to arrive at Go New York's bus yard in Brooklyn at 5:00 a.m. to pick up a tour bus and drive it into to Manhattan.  Alvarado Tr. at Ex. Z, pp. 88-89.   Since Go New York's passenger tours usually did not begin until 9:00AM, and never before 8:00 a.m., the bus yard did not open until 7:00AM, or a few minutes before 7:00AM, each day, and there would be no need for any drivers to arrive as early as 5:00 a.m.  When Alvarado worked for Go New York, the yard would be opened at 7:00AM by a mechanic, a supervisor or a driver's supervisor named John Littlejohn (called "Troop" by the drivers).   Bus drivers would arrive at the bus yard to start their shifts no earlier than 7:30 a.m. and usually between 8:00 and 8:30 a.m. *See supra*, ¶¶ 55-59.  Alvarado's assertion that he was required to arrive for work at 5:00 a.m. every day was a blatant falsehood.

89.     Alvarado also claimed that he wrote down the hours that he worked in a notebook and that he had the notebook in his house.  Alvarado Tr. at Ex. Z, pp. 95-99.  Since Mr. Alvarado appeared for his deposition from home via Zoom, he was given time to search for and retrieve the notebook (over five years after he commenced this action) and claimed that it must have gotten lost.  *Id.*, pp. 99-102.  The Zeller Firm had taken no steps prior to the deposition to locate and produce Alvarado's notebook---indeed, it appears that prior to the deposition the Zeller Firm had not been aware of its existence.

90.    Alvarado's deposition was continued on June 30, 2021.  A true and correct copy of the transcript (hereinafter "Alvarado Tr. II") is annexed hereto as **Exhibit NN**.  Alvarado testified that he looked for the notebook again but could not locate it.  He also confirmed that he was never told to preserve documents.  *Id.*, pp. 17- 20, 42.

91.    The Zeller Firm also submitted an Affidavit from Class Representative Falquez to this Court in support of class certification in which Falquez falsely claimed that in 2013 "[w]ith the exception of approximately three weeks, I worked for the defendants approximately between eleven and thirteen hours per day approximately five days hours [sic] per week." (Falquez Aff. at Ex. K, ¶ 4.)  Go New York's contemporaneous time records, however, show that Falquez only worked at Go New York for a total of 31 days and during that time, he never worked between 11 to 13 hours per day.  A true and correct copy of Go New York's time records for Falquez are annexed hereto as **Exhibit OO** (Bates Nos. D000017-109).

92.    Since Go New York only owned a handful of buses and ran as few as a single tour each day in 2013, Falquez's claim is as preposterous as Alvarado's exaggerated hours.  Falquez was confronted with these time records at his deposition and was asked the following questions and gave the following responses:

> Q: Okay.  Do you have any records of the time that you picked up the bus at any time during the months that you worked for Go New York?
>
> A: No.
>
> Q: Okay.  So you just have a specific memory of the hours that you picked up the bus each day when you worked at Go New York?
>
> Mr. Gurrieri: Objection to form.  He can answer.
>
> A: That's how it is.

*See* Deposition of Luis Falquez, taken on April 23, 2021 (hereinafter "Falquez Tr."), a true and correct copy of which is annexed hereto as **Exhibit PP**, p. 70, lines 5-15.

> Q: "So for this week, is this one of the weeks that you didn't work
>
> five days a week?
>
> A: I don't remember.  The truth is I don't remember.
>
> Q: Okay. So you have no documents that would contradict that you
>
> only worked four days a week this week right?
>
> Mr. Gurrieri: Objection to form.  He can answer.
>
> A: *No*.

*Id.*, p. 96, lines 4-14

93.     Another driver, Lionel Briggs, admitted that he grossly overstated his hours in the Affidavit he signed and which was submitted to this Court by the Zeller Firm in support of class certification.  In his Affidavit, Briggs stated that he "worked for the defendants approximately 60 hours per week and sometimes more."  (Ex. N.)  At his deposition, however, Briggs admitted that he worked a total of five weeks for Go New York and testified "***okay, I'm not saying every week but I'm saying I've worked about 60 hours a week***" and that "***I don't think nobody in their right state of mind can work 60 hours a week*** . . .".  Briggs Tr. at Ex. Y, pp. 37-47. (Emphasis added.)

94.     Yet another driver, Lawrence Atkinson, also admitted that he grossly overstated his hours in the Affidavit he signed and which was submitted to this Court by the Zeller Firm in support of class certification.  In his Affidavit, Atkinson claims that he "work[ed] for the defendants approximately between twelve and thirteen hours per day approximately five days per week".  (Ex. M, ¶4.)  At his deposition, however, he admitted that the number of hours that he

worked changed seasonally, and that in the winter he could work as few as six hours a day. Atkinson Tr. at Ex. AA, pp. 44-46.

### VI. *Prior to October 6, 2014, Go New York Paid Drivers in Cash For Overtime in Cash.*

95.     Alvarado and Falquez have repeatedly lied about receiving cash payments for overtime hours that they worked for Go New York in 2013 to 2014 in their sworn Affidavits and at their depositions.  *See* Alvarado Aff. at Ex. J, ¶¶ 7-8; Alvarado Tr. II at Ex. NN,, p. 13, line 22 – p. 15, line 5; p. 27, lines 10-13; p. 36, line 4 – p. 37, line 10; *See* Falquez Aff. at Ex. K, ¶ 5 ("The defendants paid me approximately $13.00 per hour for the hours I worked up to forty per week and approximately no wages for the hours I worked over forty each week"); Falquez Tr. at Ex. PP, p. 50, line 1 to p. 51, line 18.  *See also id.*, p. 91, lines 19 – p. 92, line 23; *id.*, p. 123, line 15 – p. 124, line 2.

96.     Other drivers that have been deposed, such as Party Plaintiff Lionel Briggs, also flatly lied about receiving cash for overtime.  *See* Briggs Tr. at Ex. Y, p. 58, lines 4-20.  These drivers attempted to conceal these cash payments in order to justify false claims of being underpaid. *See* Am. Comp., ¶¶ 45-47; 53-61.

97.     These drivers' false claims to never have received compensation for overtime in 2013 to 2014 is disproven by uncontroverted documentary evidence from Go New York, Go New York's witnesses, other drivers' testimony, and their own admissions during their depositions.  Indeed, the record of documents and testimony confirms that in 2013 to 2014, drivers always were paid in cash for overtime.  In fact, this was often done at the ***drivers' request***.[1]

---

[1] As set forth in Section II, from the beginning of this case, Go New York has conceded that it failed to pay drivers the entire time and a half rate to which they were entitled for overtime for this limited time period, and it has offered to make them whole by paying the additional "half" above their regular rate of pay. *See supra*, pp. ____.

98.     Go New York's President, Mr. Kostadinov, testified as follows at his deposition:

So, the policy then [was to pay overtime in cash to drivers] and then, I started
getting approached by drivers as I was hiring a couple more people.  I started
getting approached that, 'can I pay them cash?' So, they wanted cash.  Some of
them would want everything cash.  Some of the would want, you know – there are
times they said everything they want, obviously.  But they would definitely want,
after 40 hours to get cash, so's that's how this whole cash thing came about.  It is
not that I came up with it, it just happened that I was asked to do it, and I agreed
to do it.

Kostadinov Tr. at Ex. S, pp. 117-118.  *See also* Baran Tr. at Ex. T, p. 28, lines 10-18, (*stating* "I

believe there were some drivers who asked for cash because of some personal issues.  And later,

like, more drivers wanted the same"; p. 57, line 9 – p. 58, line 2, *stating* "[b]ased on my

observation, I see that most of the drivers wanted to get payments in cash.  They were happy to

get payments in cash . . . [n]obody complained that they are getting cash payments.  I remember

everybody – all bus drivers was happy to receive cash").

99.     At his deposition, Plaintiff Atkinson testified that drivers preferred to receive their

payments for overtime in cash.  He was asked about a conversation that he had with another bus

driver that works at Go New York and he testified that he discussed with her "[that we weren't

getting time and a half.  You know, I mean, looking in the envelope and seeing the cash was

beautiful.  But we weren't getting time and a half."  (Atkinson Tr. at AA, p. 97, line 15 – p. 98,

line 18.)

100.    The false testimony of Alvarado and Falquez, among others, was further refuted

by numerous drivers that confirmed that they were paid in cash for overtime in 2013 to 2014.

Several of these drivers specifically confirmed the company's practice of paying the drivers for

straight time by check and for overtime in cash which were placed into a single envelope as

described by Mr. Baran and Ms. Kostadinova.  Lawrence Atkinson, who worked as a driver for

Go New York from December 2013 to March 2021, testified as follows:

> Q: So as soon as you started, you got the $12 an hour, and then it
> increased to $15 an hour after the first 30 days, right?
>
> A; Yes, ma'am.
> Q: How were you paid in those years, the early years?
>
> A: I was paid 40 hours with the check, and the rest was – cash in
> an envelope.

Atkinson Tr. at Ex. AA, p. 60, lines 7-22.  He further testified that " . . . You know, I mean,

looking in the envelope and seeing the cash was beautiful."   *Id.*, p. 97, line 15 – p. 98, line 18.

Another driver who worked for Go New York from March 2013 to January 2014, William T.

Stewart also confirm this and testified as follows:

> Q: How were you paid for the hours you worked overtime?
>
> A: In cash.
>
> Q: Who paid you the cash for overtime?
>
> A: It was attached to our pay stub – our paycheck, sorry.

Stewart Tr. at Ex. DD, p. 28, line 19 – p. 29, line 4.  Mr. Stewart further testified that even if

drivers received their regular pay by direct deposit, they would go to the office to pick up the

cash payments for their overtime hours "[b]ecause those who had cash had cash right there."  *Id.*

p. 95, line 10 – p. 96, line 16.

101.    Party Plaintiff Andrew Wong testified that he picked up a check for straight time

and cash for overtime from Go New York's office.  *See* Deposition of Andrew Wong, taken on

Jan. 27, 2022 ("Wong Tr."), a true and correct copy of which is annexed hereto as **Exhibit QQ**,

p. 54, line 10 – p. 55, line 11.

102.    Although the drivers admitted to receiving cash payments for overtime, they

invoked their Fifth Amendment privilege not to answer the question of whether they reported

these cash payments to the IRS.  *See* Atkinson Tr. at Ex. AA, p. 79, lines 14-15, p. 83, lines 11-

17; Stewart Tr. at Ex. DD, p. 30, line 6 – p. 31,  line 4; Briggs Tr. at Ex. Y, p. 56, line 22 – p. 57, line 3.

### VII. *Go New York Bus Drivers  Have Always Been Paid More Than the Minimum Wage.*

103.    Pay stubs submitted by Alvarado to the Court show that he was paid a rate of $12.00 to $15.00 an hour when he worked for Go New York from August 16, 2013 to March 9, 2014. *See* Alvarado Aff. at Ex. J, ECF Doc. No. 19, refiled as ECF Doc. No. 69-1.

104.    Falquez's pay stubs also reflect that he was never paid less than $12.00 an hour during the time that he worked for Go New York from September 26, 2013 to October 28, 2013. *See* Falquez Paystubs at Exhibit OO (Bates Nos. D000020, 22, 25, 28).

105.    Falquez admitted at his deposition that he was paid above minimum wage when he worked at Go New York in 2013.  *See* Falquez Dep. at Ex. PP, p. 48, lines 11-20.    Other drivers admitted that they were always paid above minimum wage. *See, e.g.,* Briggs Tr. at Ex. Y, p. 52, lines 17-22.

106.    Go New York has produced thousands of pages of documents that irrefutably prove that drivers have been paid above minimum wage since the company began operations through to the present.  The independent sets of documents produced by Go New York include pay stubs.

107.    As an example, true and correct copies of drivers' paystubs from January 2013 reflecting that they were paid a minimum of $12.00 per hour plus bonuses, Bates Nos. D004237-4255, are annexed hereto as **Exhibit RR**.

108.    As another example, true and correct copies of drivers' paystubs from April 2013 reflecting that they were paid a minimum of $12.00 per hour plus bonuses, Bates Nos. D001097-1124, are annexed hereto as **Exhibit SS**.

109.    Prior to retaining SPLI on April 6, 2017, Go New York also provided drivers with "Personal Earning Statements" (produced to Plaintiffs with Bates Nos. D017130-17908).

110.    Drivers also received W-2 Wage and Tax Statements and W-4 to each driver. These documents have been produced to Plaintiffs.

### VIII.    *Go New York Bus Drivers Collected Cash Tips.*

111.    Several drivers that were deposed confirmed that drivers received cash tips during this time period.  They also testified that the bus driver and tour guide for each tour  usually would split the cash tips 50/50.  *See* Atkinson Tr. at Ex. AA, pp. 79 – 82; Briggs Tr. at Ex. Y, p. 52, line 25 – p. 54, line 6; Stewart Tr. at Ex. DD, p. 50, lines 9-22.

112.    They also testified that the bus driver and tour guide for each tour  usually would split the cash tips 50/50.  *See* Atkinson Tr. at Ex. AA, pp. 79 – 82; Briggs Tr. at Ex. Y, p. 52, line 25 – p. 54, line 6; Stewart Tr. at Ex. DD, p. 50, lines 9-22.   Stewart testified as follows:

> Q: Was there a tip box on the bus when you were driving for Go New York Tours?
>
> A: Yes, ma'am.
>
> Q: What would happen to the cash – did you take it, did the tour guide take it or something else?
>
> A: At the end of the tour we would split the cash.
>
> Q: How did you split it?
>
> A: The tour guide would count it and he would give me half.
>
> Q: So it was a 50-50 split?
>
> A: Yes, ma'am.

Stewart Tr. at Ex. DD, p. 50, lines 9-24.  According to Stewart, he made "[p]robably a little more than a thousand" dollars in tips during the approximately 10 months that he worked for Go New

York. *Id.* at p. 63, line 21 – p. 64, line 7.  When asked whether he reported these cash tips to the IRS, Stewart again invoked his Fifth Amendment privilege not to answer the question.  *Id.*, p. 64, lines 8-10.

113.    Additional drivers that admitted receiving cash tips asserted their Fifth Amendment privilege against self-incrimination when asked whether they reported these cash payments to the IRS, and they declined to state whether or not they reported these cash payments to the IRS.  *See* Atkinson Tr. at Ex. AA, pp. 78-79; Briggs Tr. at Ex. Y, pp. 55-56.

### IX.    *Go New York Posted Wage And Hour And Workers' Rights Notices For Its Employees*

114.    There is no evidence to support Plaintiffs' claim that Go New York failed to comply with laws requiring it to post wage and hour and workers' rights notices for its employees.  In fact, the evidence establishes that Go New York posted these notices from the company's inception to the present, and drivers testified that they recalled seeing them.  *See* Atkinson Tr. at Ex. AA, p. 107, line 22 – p. 111, line 2; Stewart Tr. at Ex. DD, p. 67, line 20 – p. 68, line 2.  Atkinson testified as follows:

> Q: Did you ever notice a bulletin board in the – inside the garage?
>
> A: Yes.

(Atkinson Tr. at Ex. AA, pp. 107, line 22 – p. 108, line 11.)

> Q: Okay. When you walked in to go to the lunch room and you walked out to go pick up your bus, you pass that bulletin board?
>
> A: Yes.
>
> Q: What would be posted on that bulletin board?
>
> A: Workers' rights.  That's the only thing I can remember.

Q: When do you recall seeing those workers' rights posted on that bulletin board?

A: I guess when I first started.

Q: How big was the bulletin board?

A: It was pretty big. I would say – I don't know.

Q: I'm trying to think of something to compare it to. Was it bigger than, like, your computer monitor?

A: Yeah. Yes.

Q: How about – it looks like you have – we will use it for size. It looks like you have a TV setup back there. Was it bigger than that, in your apartment? Sorry, I'm trying to use a size you would be able to –

A: I guess it was a little bigger than that, yeah.

*Id.*, p. 109, line 17 – p. 110, line 20.

### X.   *Go New York Provided Drivers With Uniforms and No Special Maintenance Was Required.*

115.   The evidence establishes that the drivers' uniforms at Go New York consisted of a cap, a shirt, black pants and, in colder seasons, a jacket. *See* Alvarado Tr. at Ex. Z, p. 67, lines 14-25; Falquez Tr. at Ex. PP, p. 147, line 14 – p. 148, line 24; Atkinson Tr. at Ex. AA, p. 74, line 17 – p. 76, line 7; Stewart Tr. at Ex. DD, p. 66, line 4 – p. 67, line 6.

116.   In the Complaint, the Zeller Firm falsely alleged that Alvarado "purchased a required uniform, and the defendants failed to reimburse the plaintiff the total cost of the uniform" was false and continue to maintain this claim today. *See* Ex. A, ¶ 27; Ex. V, ¶42.

117.   In fact, drivers were never required to purchase uniforms. Rather, Go New York provided drivers with uniforms when they were hired and as needed thereafter at no cost to the drivers. *See* Atkinson Tr. at Ex. AA, page 74, line 17 – p. 76, line 7; Stewart Tr. at Ex. DD, p.

66, line 4 – p. 67, line 6; Kostadinov Tr. at Ex. S, pp. 127-29; Baran Tr. at Ex. T, p. 32, lines 5-17. At the drivers' request, any part of their uniform would be replaced as needed. *See* Atkinson Dep. at Ex. AA, page 74, line 17 – p. 76, line 7.

118.    The uniforms provided to the drivers by Go New York did not require any special maintenance. *See* Atkinson Tr. at Ex.AA, page 77, lines 4-7 ("Q: Did you have to dry clean any of the garments that they gave you, or did you just wash them? A: Just regular wash".); Wong Tr. at Ex. QQ, p. 75, line 14 – p. 80, line 2 (testifying that he was given multiple components of his uniform that the only cost he incurred to clean them was "[w]hatever the laundromat is charging. Whatever it costs to dry my clothing").

### XI.    *The Evidence Establishes that the Zeller Firm Induced the Drivers to Make Material Misrepresentations to the Court to Fabricate FSLA and NYLL Claims Against Defendants.*

119.    The proof in this case further establishes that drivers, including Alvarado and Falquez, were induced by the Zeller Firm to provide blatantly false testimony about Go New York's compensation policies and practices. For example, they purposely concealed the fact that they received cash payments from Go New York to compensate them for any hours that they worked over 40 hours a week. They also purposely concealed that they were paid bonuses by Go New York. Finally, they purposely concealed that they received cash tips from tour bus passengers. Their testimony is disproven by uncontroverted documentary evidence from Go New York, Go New York's witnesses, other drivers' testimony, and their own admissions during their depositions.

### A. *Plaintiff and Class Representative Victor Alvarado Balderramo.*

120.    Plaintiff Alvarado's admitted at his deposition that he did not work the "approximately six days per week and between seventy and eighty-seven hours per week, except

for two weeks where I only worked five days per week and worked between fifty-five and sixty-

five hours per week" that he claimed to work in his sworn Affidavit submitted to this Court.  (Ex.

J, ¶ 3.)

121.    Alvarado was asked the following questions and gave the following responses:

> Q: If the Judge asked you, how do you know that you worked six days a week and between 70 and 87 hours per week, what is your proof of that, what are you going to answer?
>
> MR. GURRIERI: Objection to form.  It's a hypothetical.  You can answer.
>
> A: If we count the hours when I start at the garage and the hours when I finish at the garage, and we could all those hours, there will be more than 40 hours.
>
> Q: How do you get to six days though?
>
> A: Because there were a few weeks when I worked six days.
>
> Q: In Paragraph 2, it says you were employed by Go New York from August 2013 untl February 2014; is that accurate? . . .
>
> A: Yes, correct.
>
> Q: So your testimony is that during – from August 2013 until February 2014, you worked six days a week, except for two weeks where you only worked five days a week, and during those six-day weeks, you worked between 70 and 87 hours per week; its that correct?
>
> A: ***It wasn't all of the weeks that I worked six days.  I would say that an average of four weeks that I worked six days.***

Alvarado Tr. at Ex. Z, p. 155, line 16 – p. 156, line 21.  (Emphasis added.)   Alvarado thus

admitted that he falsely inflated the hours in his Affidavit by claiming that he worked six days a

week every week even though it was only "an average of four weeks" of the three months that he

worked for Go New York.  *Id.*

122.    Alvarado further testified as follows:

Q: Okay. Where did you get 70 to 87 hours per week, how did you calculate that?

A: Counting the hours from 5 a.m. when I start working until six or seven or either in the evening for five or six days, and then it comes up to that number of hours.

Q: But you don't have any records that show that you started working at 5 a.m. and that you worked until 6 p.m. each day; right?
. . .

A: I don't have it in my hands.

Q: Does someone else have the documents?

A: I have no idea.

Q: Have you seen those documents before?

A: No. No. I don't remember.

*Id.*, p. 161, line 14 – p. 162, line 6.

123.    According to Go New York's records Alvarado's claim to have worked 70-87 hours per week is false.  These records, Bates Nos. D000029 – 79, have been authenticated by Eduard Baran and show that Alvarado never worked more than five days a week and never more than 46 hours and 55 minutes in a single week.

124.    At his deposition, Plaintiff Alvarado admitted that he had no proof to support his claim that he worked six days a week and a total of 70-87 hours in his Affidavit.  *See* Ex. Z, p. 134, line 25 – p. 135, line 8 (*stating* "No, I don't have any records"); p. 138, lines 11-13; p. 139, line 24 – p. 135, line 5; p. 147, lines 5 – 11; p. 160, line 16 – p. 161, line 13. *See also* Ex. NN., p. 16, lines 15-20; p. 17, line 25 – p. 18, line 7; p. 42, lines 9-16.

125.    In order to concoct some kind of story that could possibly explain his blatant misrepresentation to the Court about the days and hours that he worked for Go New York, Alvarado testified that from December 2013 to February 2014, he was required to arrive at Go

New York's bus yard "at 5:00 a.m. to pick up the bus at 5:10, and then I will drive to Manhattan, and because of the traffic, I will get there at 7:30, and then I will be working until 6:30, and then after I finish work, it will take me two hours to go back to the parking [*sic*] to return the bus." *See* Ex. Z, p. 88, lines 8-22; pp. 94-97; *see also* Ex. NN, p. 152, line 7 – 153, line 9.)

126.    As set forth above, Go New York tours did not begin until around 9 a.m. and the bus yard did not open until around 7 a.m. *See supra*, ¶¶ 55-56.   Other drivers testified that their shifts began around 7:30 a.m. and that tours did not start until 9:00 a.m. *See, e.g.,* Atkinson Tr. at Ex. AA, p. 38, line 3 – p. 39, line 11.

127.    Tellingly, at his deposition, Alvarado could not recall the name of any other person who was at the bus yard when he supposedly arrived at 5:00 a.m. including the "two or three drivers" that he claimed would arrive even earlier then him supervisors or mechanics. *See* Ex. Z, p. 97, line 24 – p. 98, line 12, p. 112, line 12 – p. 113, line 18; *see also* Ex. NN, p. 50, line 14 – p. 55, line 7.

128.    Go New York's records further demonstrate that Plaintiff Alvarado's claim that he had to arrive at the bus yard at 5:00 a.m. every day was false.   To the contrary, he was supposed to start work at 7:00 a.m., but he was late on several occasions. *See* Ex. BB, at D000029 – 45.

129.    Go New York's records show that there was a single day on which Alvarado began work at 5:00 a.m. *See* Ex. BB, D000042.  On that day, he was scheduled to arrive at 5:00 a.m. to give a special, private tour. *Id.*

130.    Plaintiff Alvarado's representation in his Affidavit submitted to this Court that he was never paid by Go New York more than forty hours per week "even though I worked greater than forty hours each week" (*see* Ex. J) was false.

131.    Go New York's time records show that Alvarado was paid for up to 40 hours by check and for any overtime hours by cash at the same rate as straight time.  For example, for the week of September 30, 2013 to October 6, 2013, Mr. Baran's notes show that Mr. Alvarado worked five days that week and a total of 45 hours.  *See* Ex. BB at D000037.  Mr. Baran's notes reflect that Mr. Alvarado was paid for the 40 hours of regular time by check, and $75.00 in cash for five hours of overtime at a rate of $15.00 per hour.  *Id.*

132.    In an effort to support his false claim that he was never paid overtime, Alvarado falsely testified in his Affidavit and at his deposition that he never received cash payments for overtime from Go New York.   *See* Ex. Z*,* p. 13, line 22 – p. 15, line 5; p. 27, lines 10-13; p. 36, line 4 – p. 37, line 10.   In fact, at the time Alvarado worked for Go New York, it was the company's policy to pay drivers for up to 40 hours by check and for any overtime hours by cash at the same rate as straight time. *See supra*, ¶ 65-73.

133.    Go New York's records reflect that Alvarado was paid in cash for overtime.  Mr. Baran's handwritten time records reflect the amount of cash payments that Alvarado was paid for each week that he worked more than 40 hours.  *See* Ex. BB at D000029 – 45.

134.    Additionally, Go New York has produced receipts signed by Alvarado for the cash payments that were paid to Alvarado in which he acknowledged receipt of the cash amount and that the "payment constitute[d] full payment and satisfaction of the hours and the overtime worked for Go New York Tours, Inc." *See* Ex. EE, at D000046 – 54.

135.    During his deposition, Alvarado confirmed that he signed the receipts *See* Ex. Z, pp. 12-16; pp. 24-27; p. 33-37; p. 122, lines 3-14.

136.    Faced with proof that he signed receipts for the cash that he received for overtime hours, Alvarado's explanation for the receipts was that he just signed them "[t]o receive my check." *Id.*, p. 26, lines 7-8.

137.    Additionally, at his deposition, Alvarado confirmed that during the time that he worked for Go New York, he was in arrears for the child support for the two oldest of his five children and whom no longer resided with him. *Id.*, p. 43, lines 3-14. Therefore, he could keep any payments that he received in cash from Go New York and avoid his child support obligations.

138.    Plaintiff Alvarado also falsely claimed to never have received cash tips in accordance with Go New York's policy when he worked there from December 2013 to February 2014. *Id.*, p. 49, lines 6-24. This is contrary to testimony from other drivers as well as Messrs. Kostadinov and Baran. *See supra*, ¶¶ 111-113.

139.    This is not the only lawsuit that the Zeller Firm has brought on behalf of Alvarado. Less than one week before filing this Complaint in this action, they commenced another action against Alvarado's prior employer, Taxi Tours Inc. d/b/a Big Taxi Tours ("Taxi Tours") and its owner. *See* Ex. B. Alvarado alleges the same statutory claims against Taxi Tours as he alleges in this case. *Id.*, ¶¶ 27-62. In that case, he claimed that he worked for Taxi Tours from July 2010 to April 2013, and that he worked 72 to 84 hours a week. *Id.*, ¶¶ 17, 19.

140.    On November 25, 2019, Alvarado settled the case against Taxi Tours in exchange for a $100,00.00 total payment. A copy of the Settlement Agreement is annexed hereto as **Exhibit TT**. As set forth therein, the case was settled by Taxi Tours' insurer for $100,000.00 on behalf of Alvarado only. Alvarado received a payment of $67,549.50 for purported hours that he worked overtime and was not paid for by Taxi Tours, and other alleged technical violations

regarding notice of pay.  The Zeller Firm would receive a payment of $33,774.75 for attorneys' fees and costs.  *Id.*  Plainly, Alvarado and the Zeller Firm seek to recover a similar windfall here.

**B. *Plaintiff and Class Representative Luis Falquez.***

141.   Falquez's representation to this Court in Paragraph 2 of his Affidavit that he worked for Go New York "from July 2013 until October 27, 2013" was false.  *See* Ex. K, ¶ 2.

142.   Evidentiary proof confirms that Mr. Falquez only worked for Go New York from September 26, 2013 until October 27, 2013, or a total of 31 days.

143.   On September 26, 2013, Falquez signed an "Article 19-A Bus Driver Application" to work as a bus driver for Go New York.  *See* Bates No. D000085 at Ex. CC.

144.   On September 26, 2013, Falquez also signed an IRS Form W-4 also signed by Falquez to work as a bus driver for Go New York.  *See* Bates No. D000086 at Ex. CC.

145.   On November 1, 2013, Go New York issued a letter to Falquez stating that "[y]our employment with Go New York Tours Inc. will be officially terminated on October 28, 2013."  *See* Bates No. D000027 at Ex. CC.

146.   Falquez's representation in his Affidavit that "[w]ith the exception of approximately three weeks, I worked for the defendants approximately between eleven and thirteen hours per day approximately five days hours [sic] per week" was false. Falquez Aff. at Ex. K, ¶ 4.  He only worked at Go New York for a total of 31 days.  During that time, Falquez never worked between 11 to 13 hours per day.

147.   Go New York's time records for Falquez, which have been authenticated by Eduard Baran, show that worked less than 40 hours each of the five weeks that he worked for Go New York with the exception of a single week that he worked 46 hours and 15 minutes.   Go

New York's records reflect that Falquez was paid $81.00 in cash for the 6 hours and 15 minutes of overtime that he worked that week. *See* D000021 at Ex. CC.

148.    Plaintiffs have no documents that contradict these time records. Falquez confirmed this during his deposition, and was asked the following questions and gave the following responses:

> "Q: Okay. Do you have any records of the time that you picked up the bus at any time during the months that you worked for Go New York?
>
> A: No.
>
> Q: Okay. So you just have a specific memory of the hours that you picked up the bus each day when you worked at Go New York?
>
> Mr. Gurrieri: Objection to form. He can answer.
>
> A: That's how it is."

Falquez Tr. at Ex. PP, p. 70, lines 5-15. (*See also id.*, p. 89, lines 20-24, Q: "Do you have any documents supporting your allegation that you worked for the defendants between 11 and 13 hours a day except for three weeks? A: No."; *id.*, p. 93, lines 7-20, testifying that he was warned by other drivers to keep track of his hours, that he kept track on "a piece of paper", and that he does not have them anymore; *id.*, p. 96, lines 4-14 Q: "So for this week, is this one of the weeks that you didn't work fives days a week? A: I don't remember. The truth is I don't remember. Q: Okay. So you have no documents that would contradict that you only worked four days a week this week right? Mr. Gurrieri: Objection to form. He can answer. A: No.") Falquez continued to falsely assert that he began working for Go New York "since July" 2013 during his deposition. *Id.*, p. 133, lines 6 – 8, "Q: How many weeks had you been working for Go New York by October 16, 2013? A: I was there since July."

149.    At his deposition, Falquez denied ever receiving any payments whatsoever for time that he worked over 40 hours per week.   *See* Falquez Tr. at Ex. PP, p. 50, line 1 to p. 51, line 18.   *See also id.*, p. 91, lines 19 – p. 92, line 23; *id.*, p. 123, line 15 – p. 124, line 2. This testimony was false.   Go New York's records reflect that on the one occasion that he worked overtime, he was paid cash for that time.   When Falquez was shown these records confirming that he received $81 in cash for the only week that he worked more than 40 hours at his deposition, his response was "What can I tell you?  I never received those $81."  *Id.*, p. 127, line 16 – 128 – 11; *see also id.*, p. 159, line 24 – 160, line 2, Q: "Did you receive any income in cash during the year 2013? A: No."

### C. *Plaintiff Lawrence Atkinson*

150.    At his deposition, Plaintiff Atkinson confirmed that his representation to this Court in his Affidavit that he "work[ed] for the defendants approximately between twelve and thirteen hours per day approximately five days per week" was false.  *See* Atkinson Aff. at Ex. M, ¶ 4.  He testified as follows:

> Q: I just want to go over some statements in your affidavit.   In paragraph 4, you say, "I worked for the defendants approximately between 12 and 13 hours per day, approximately five days a week."  Do you see that there?
>
> A: Yes.
>
> Q: But during the winter, you wouldn't be working working the 12 and 13 hours, right?  You said it could be as little as six hours?
>
> A: Right.  You're right.

Atkinson Tr. at Ex. AA, p. 95, lines 7-18.

### D. *Plaintiff Lionel Briggs*

151.     Plaintiff Briggs states in Paragraph 3 of his Affidavit that "[t]he defendants employed me for approximately six months after 2011 and before 2014." Briggs Aff. at Ex. N, ¶ 3.

152.     At his deposition, Plaintiff Briggs admitted that his claim to have "worked for the defendants approximately sixty hours per week and sometimes more" in the Affidavit that he submitted to this Court was false.

153.     At his deposition, Briggs was shown time records maintained by Go New York and asked the following questions and provided the following responses: "Q: You wrote in your Affidavit "I worked for the defendants approximately 60 hours per week and sometimes more." My question is, did you or did you not work approximately 60 hours per week and sometimes more every week that you worked for Go New York Tours?  A: At least one -- at least two -- I worked at least about 60 hours a week, okay, I'm not saying every week . . . No, not every week; no.  I didn't work every week.  Q: How many weeks out of the total weeks that you worked for Go New York Tours did you work approximately 60 hours or more?  A: I could recall, I would say most definitely about at least possibly five, but I can't recall after that."  Briggs Tr. at Ex. Y, p. 48, line 21 – p. 49, line 18.

154.     Briggs further testified that "I don't think nobody in their right state of mind can work 60 hours a week . . ."  *Id.*, p. 45, line 4 – p. 47, line 12.)  He was asked the following questions and gave the following responses:

> Q: My question is, I am trying to figure out why you would tell the court you worked 60 hours a week and sometimes more when time records show the most you ever worked a week was 43.3 hours. So, my question to you is, what is your basis for saying you worked 60 hours a week and sometimes more?

A: I'm not saying I worked 60 hours a week every week, but I have worked 60 hours in a week . . . I didn't tell the court every single week. I know there were some weeks I worked and didn't get paid for it. I don't think nobody in their right state of mind can work 60 hours a week, but I didn't get paid for the times that I have worked, I did long hours and I don't know if this is correct or not; this right here, they make this up.

Q: I asked to show him his affidavit – I think you said "no one in their right state of mind can work 60 hours a week" is that what you said?

A: Yes, driving, you cannot; it's a law. You can't be a driver and work that long, you have to get rest as a driver, you have to have at least ten hours of rest before you can come back on, it's a DOT law, Federal Rules and Regulations.

*Id.*, p. 44, line 17 – p. 46, line 20.) He went on to testify as follows:

A: . . . "[y]ou can't be a driver and work that long, you have to get rest as a driver, you have to have at least ten hours of rest before you can come back on, it's a DOT law, Federal Rules and Regulations."

Q: So why would you tell the court you were violating that law?

A: What did you say?

Q: You're saying you violated that law, because you're telling the court you worked 60 hours a week and sometimes more.

A: I said sometimes I would work 60 hours a week, I didn't say every day. Every day you can't work by law 60 hours a day (sic), you can't do that as a driver . . . My question is, did you or did you not work approximately 60 hours per week and sometimes more every week that you worked for Go New York Tours?

A: At least one – at least two – I worked at least about 60 hours a week, okay, I'm not saying every week but I'm saying I've worked about 60 hours a week. So what would the question be 'yes' or 'no'?

Q: My question is, did you work that many hours every week –

A: No, not every week, no. I didn't work every week.

> Q: How many weeks out of the total weeks that you worked for Go
> New York Tours did you work approximately 60 hours or more?
>
> A: I could recall, I would say definitely about at least possibly five,
> but I can't recall after that."

*Id.*, p. 46, line 17 – p. 49, line 18.

### E. *Plaintiff William T. Steward (a/k/a "William Stewart")*

155.      Stewart worked as a tour bus driver for Go New York from March 2013 to

January 2014. *See* Stewart Aff. at Ex. O.

156.      There is documentary evidence that Stewart received a settlement from the

National Labor Relations Board in September of 2014 for the time and a half pay that he was not

paid for overtime when he worked for Go New York. A copy of a Settlement Agreement in the

matter *Go New York Tours, Inc. (Charged Party) and Local 621, Industrial Construction Trades

and Industrial Employees Union (Charging Party)*, Cases 02-CA-119204, 02-CA-124414, is

annexed hereto as **Exhibit UU**. As set forth therein, Stewart received a settlement payment for

backpay due in the amount of $6212.00.

157.      Also, a copy of an email from a Field Attorney, Alejandro A.Ortiz, Esq., to Go

New York's former counsel is annexed hereto as **Exhibit VV**. As reflected therein, the NLRB

settlement compensated Stewart for time and a half for overtime.

158.      There is documentary evidence that the settlement payment of $6212.00 that

Stewart received for backpay from Go New York was reported to the IRS. A Form W-2 Wage

and Tax Statement for compensation in the amount of $6212.00 in 2014 to William Stewart with

an address of 9602 Glenwood Rd, Brooklyn, NY 11236 is annexed hereto as **Exhibit WW.**

159.      Despite the 2014 Settlement, Stewart agreed to join the class of Plaintiffs in this

case to try to recover additional money for the claims that he had settled. On September 23,

2016, Stewart signed an Affidavit of Plaintiff in Support of Motion to Certify a Class which was notarized by Attorney Gurrieri.  *See* Ex. O.  Although his name is "William T. Stewart", the Affidavit was drafted in the name of "William T. Steward".  *Id.*  Stewart's address in the Affidavit is 9602 Glenwood Rd, Brooklyn, NY 11236, the same address in the W-2 for the settlement payment.

160.      When confronted with the Settlement Agreement and the W-4 Form during his deposition, Stewart claimed that he had never seen the documents before.  He testified as follows:

> Q: My question is, the settlement agreement is in the amount of $6,212 and then this W-2 is $6,212. Do these documents together refresh your recollection that you received a settlement payment from Go New York Tours from a claim that you made to the National Labor Relations Board?
>
> A: No, ma'am.
>
> Q: What was this $6,212 for, why were you paid that amount?
> MR. GURRIERI: Objection to the form, mischaracterizes prior testimony.  You can answer.
>
> A: I don't know.
>
> Q: Did you receive $6,212?
>
> A: Like I said, I don't know, I don't think I did – no.  If it did it went straight to my account.  I don't know, I couldn't tell you.  I know I never received a check.  I know that for sure.

Stewart Tr. at Ex. DD, p. 59, line 13 – p. 60, line 7.

161.      Plaintiff Stewart states in Paragraph 5 of his Affidavit that "I worked for the defendants approximately between fifty and fifty-five hours per week.  I worked for the defendants between five and six days per week."  *Id.*, ¶ 5.

162.    Plaintiff's Stewart's Allegations concerning the amount of time he worked for the Company were contrary to the Company's records and inconsistent with the amount of the Settlement.

163.    Had the Zeller Firm conducted an appropriate investigation, and in particular, had the Zeller Firm discussed with Mr. Stewart in even a cursory manner his relationship with Go New York and the circumstances of his termination, it surely would have discovered the existence of the aforesaid settlement. Instead, the Zeller Firm allowed Stewart to join the class and seek additional compensation for claims that were already settled. The failure of the Zeller Firm to have discovered the existence of this settlement prior to submitting an Affidavit from Stewart in support of class certification was, at the very least, reckless indifference to its professional obligations, and the inclusion of Stewart as a member of the class is nothing less than an attempted fraud on the Court and Go New York.

**XII.    The Zeller Firm Failed to Conduct a Reasonable Investigation of Plaintiffs' Claims and Preserve Highly Critical Evidence and Evidence Has Been _Spoliated as a Result._**

164.    Each of the drivers who were deposed admitted that they were never told to search for and/or preserve documents relating to this case. Several of them testified that at one time they possessed documents and records that would be highly relevant to whether the assertions in their Affidavits were accurate, such as notebooks, notes of time worked, e-mails and text messages, but that they no longer had those documents.

165.    The evidence in this case establishes that the Zeller Firm failed to conduct a reasonable investigation of the claims in this case and instead fabricated them out of thin air. The claims in the pleadings were boilerplate, and the Affidavits contained assertions concerning hours work that should have been preposterous on their face had the Zeller Firm conducted any

reasonable investigation.  For example, the Zeller Firm should have realized that it would have created an enormous safety hazard had Go New York allowed drivers to routinely work 10-15 hour days, and that on  their face the assertions in the Affidavits concerning the amount of hours worked were implausible.

166.    The evidence in this case further establishes that the Zeller Firm did not take any steps to preserve evidence relating to Plaintiffs' claims and that critical evidence has been destroyed as a result of their failure to do so.

167.    Plaintiff and Class Representative Alvarado testified as follows: "Q: You understand that there is evidence that was on that phone that you no longer have, right? . . .  A: Yes. Q: Is there any way that we can access that evidence now? A: No. No. I am not sure"; *See* Alvarado Dep. at Ex. S, p. 27, line 25 – p. 28, line 8.

168.    Plaintiff and Class Representative Falquez testified as follows:

> "Q: Sir, what have you done to search for documents related to your claim in this case?"

> "A: What have I done?  I don't understand."

> " Q: Okay.  Sir, when someone brings a lawsuit, they are required to preserve all documents and information that may support or refuse [*sic*] their claims relating to the case.  I'm asking you, sir, did you search for that information that should have been preserved?"

> "A: The truth is no."

Falquez Tr. at Ex. PP, p. 38, line 11 – p. 39, line 4

169.    Plaintiff Stewart testified as follows:

> Q: Did you ever take any steps to preserve any documents or keep any documents that you may have had relating to your claims in this case?

> A: No, ma'am.

Stewart Tr. at Ex. DD, p. 42, lines 7-11.

170.    Plaintiff Stewart further testified as follows:

> Q: Did you do anything to preserve any data on that phone that may relate to your claims in this case?
>
> A: No, ma'am.

*Id.*, p. 55, lines 19 – 22.

171.    Plaintiff Briggs testified as follows: "Q: Did you preserve the text messages about your schedule that were on that phone? A: No, ma'am." Briggs Tr. at Ex. Y, p. 31, lines 8-10.

172.    Plaintiff Atkinson testified as follows: "Q: You understand that there is evidence that was on that phone that you no longer have; right? MR. GURRIERI: Objection to form. You can answer. A: Yes. Q: Is there any way that we can access that evidence now? A: No. No. I am not sure." Atkinson Dep. at Ex. AA, p. 27, line 25 – p. 28, line 8.)

173.    Although it was common practice for Go New York's supervisors to communicate with drivers about their schedules and the hours that they worked by text message, drivers admitted during their depositions that they failed to preserve text messages and other data on their personal smartphones. *See* Alvarado Tr. at Ex. Z, p. 42, lines 9-16; Falquez Tr. at Ex.PP, p. 38, line 19 – p. 39, line 17; Briggs Dep. at Ex. Y, p. 30, line 11 – p. 31, line 10; Stewart Tr. at Ex. DD, p. 55, lines 19-22.

174.    Although Alvarado claimed contrary to all of the evidence that supervisors did not communicate with him via text message, he admitted that he would text his wife when he arrived at work. *See* Alvarado Tr. at Ex. Z, p. 140, line 15 – p. 142, line 15, *stating* "[i]t wasn't always. It was two or three times. It was depending on the weather, if it was snowing, I would let her

know that I arrived at work fine." Alvarado admitted that he failed to preserve any of those text messages. *Id.*, p. 143, lines 1-8, *stating* "[n]o, I don't have anything".

175.    Drivers testified that other documents relating to their claims in addition to text messages have been destroyed.

176.    Plaintiff Briggs testified that he kept track of his hours on "little pieces of scrap paper" but that "I must have thrown them away; they got lost; it has been such a long time. When I used to come home at night it used to be in my pocket." Briggs Tr. at Ex. Y, p. 38, lines 9-19. He further testified as follows:

> A: It has been so long, it's been so long, I must have got rid of the records with me moving from where I used to live at to somewhere else.
>
> Q: When did you move? . . .
>
> A: . . . I moved in 2017 . . .
>
> Q: This affidavit that you signed was on September 8, 2016.  Did you have the documents that you're referring to at the time you signed the affidavit?
>
> A: No, 2017.
>
> Q: This is signed in 2016, you said you moved in 2017 and lost the documents then.  My question is, did you have the documents then in 2016 before you moved?
>
> Mr. GURRIERI:  Objection to the form.  You can answer.
>
> A: I don't recall, I don't recall.  . . .
>
> Q: At the time that you joined this lawsuit which was around August 2016, did you have any documents relating to your employment with Go New York?
>
> A: No.
>
> Q: Okay.  What happened to those scraps of paper you just talked about?

> A: Just like I said, it got lost . . .
>
> Q: When you signed this affidavit, did you refer to those records?
>
> A: By word-of-mouth, but like I said I didn't have the papers to – I didn't have, you know, I didn't have it written down."

*Id.*, p. 49, line 19 – p. 52, line 16.

177.    Early in his deposition, Plaintiff and Class Representative Alvarado testified that he kept documents relating to both of his cases against Go New York and Taxi Tours.  *See* Alvarado Tr., p. 59, lines 11-15.  When asked where these documents were, he testified that "[t]hey are in the house.  I have to look them up."  *Id.*, p. 61, lines 7-18.  Alvarado claimed that he wrote down the hours that he worked in a notebook. *Id.*, p. 93, line 22 – 97, line 6. Since Alvarado's deposition was conducted by Zoom and he was testifying from his home, he was given time to look for the notebook that he described.  *Id.*, p. 99, line 6 – p. 101, line 3.  He was asked the following questions and provided the following answers:

> Q: Mr. Alvarado, did you conduct a search for the notebook that you testified that you kept?
>
> A: Yes.  I look all around, but I didn't find anything.
>
> Q: Where did you look?
>
> A: In all the drawers that I have all those papers.
>
> Q: Is there a desk that you have all these papers in?
>
> A: Yes, correct.
>
> Q: Where is the desk?
>
> A: It is not a desk.  It is a plastic kind of box.
>
> Q: Okay.

A: That I keep all of my papers.

Q: And where in the house is the plastic box?

A: In my bedroom.

Q: Has your attorney ever come to your house to look for documents with you?

A: No.

Q:Did you ever show that notebook to anyone else?

A: Not that I know, no.

Q: What happened to the notebook?

A: Exactly, I don't know. I don't know.

Alvarado Tr. at Ex. Z, p. 99, line 23- p. 1-1, line 3.

178.    During the second day of his deposition, Alvarado testified as follows:

Q: Okay.  So what happened to the notebook?

A: I think it was misplaced somewhere, but I have no idea where it got lost.

Q: Do you know when it got lost?
A: No, I do not remember.

Q: Do you know if it was before or after you commenced this lawsuit?

A: Before.

Q: Okay. And how do you know that?

A: I didn't have it in mind.  I didn't have any understanding of this procedure.  I didn't have any idea how these procedures work, so I didn't know to have any papers or anything like that.

*See* Ex. NN, p. 18, line 17 – p. 19, line 7.

179.    Party Plaintiff Andrew Wong testified that he never searched for documents relating to this case; when he was asked whether he was told to preserve documents, Mr. Gurrieri instructed Mr. Wong not to answer the question. *See* Wong Tr. at Ex. QQ, p. 15-17, 19-10.

180.    It is apparent from the foregoing testimony of drivers that the Zeller Firm never explained to their clients in any meaningful way their obligation to preserve and produce relevant documents and information.   They admitted that they had no understanding regarding their obligation to preserve records.   Had the Zeller Firm complied with its basic ethical and professional obligations, it would have made clear to its clients that they were obligated to preserve relevant documents, and it would have taken steps to collect such documents, including, for example, visiting their clients, and collecting or at least reviewing the data contained in cell phones and computers used by their clients during the relevant time period.   The Zeller Firm did nothing whatsoever to collect and preserve relevant documents, nor apparently did it instruct its clients to do so.   This is nothing less than professional misconduct.

### XIII.    *The Evidence Establishes that the Zeller Firm and Class Representatives* <u>*Alvarado and Falquez Should Be Disqualified From Representing the Class.*</u>

181.    At his deposition, Plaintiff Alvarado was asked "[h]ave you ever spoken with any other drivers about this lawsuit?" and answered "[n]o."   Alvarado Tr. at Ex. Z, p. 83, lines 12-16.)

182.    Falquez admitted that he has never spoken to any other members of the Certified Class about their claims in this case.   *See* Falquez Tr. at Ex. PP, p. 163, lines 6-9.  Also, contrary to his Affidavit in which he swore that ". . . many other bus drivers told me that the defendants often do not pay them for all of the hours that they worked for the defendants each week, particularly hours that they worked over forty each workweek" (Falquez Aff. at Ex. K, ¶ 8), Mr.

Falquez admitted at his deposition that the he did not know any other drivers that were not paid overtime except for Mr. Alvarado.  Falquez Tr. at Ex. PP, p. 165, lines 15-19.


Dated: New York, New York          **BARTON LLP**
      March 1, 2022

                              By: _____
                                  Maurice N. Ross (MR 6852)
                                  Laura-Michelle Horgan (LR 7799)

                              711 Third Avenue, 14th Fl.
                              New York, New York 10017
                              (212) 687-6262
                              mross@bartonesq.com
                              lmhorgan@bartonesq.com

                              *Attorneys for Defendants*
                              *GO NY TOURS INC. and*
                              *ASEN KOSTADINOV*


TO:    Justin Zeller, Esq.
        Brandon Sherr, Esq.
        John Gurrieri, Esq.
        LAW OFFICE OF JUSTIN A. ZELLER, P.C.
        277 Broadway, Suite 408
        New York, NY 10007
        Tel.: (212) 229-2249
        Fax: (212) 229-2246
        jazeller@zellerlegal.com

        *Appointed Class Counsel for Plaintiffs*